19 A.3d 1084 (2011)
In the Interest of A.B., a Minor.
Appeal of Guardian ad Litem, Appellant.
In re M.B., a Minor.
Appeal of Guardian ad Litem, Appellant.
In the Interest of B.B., a Minor.
Appeal of Guardian ad Litem, Appellant.
No. 1463 MDA 2010, No. 1464 MDA 2010, No. 1465 MDA 2010
Superior Court of Pennsylvania.
Submitted February 7, 2011.
Filed April 11, 2011.
*1085 Cynthia L. Garman, Lancaster, for appellant, Guardian Ad Litem.
Gary G. Efstration, Lancaster, for K.B., appellee.
David E. Alspach, Lancaster, for Lancaster County Children and Youth Services, appellee.
BEFORE: BOWES, MUNDY, and PLATT[*], JJ.
OPINION BY BOWES, J.:
The guardian ad litem appointed to represent B.B., A.B., and M.B. in the underlying dependency proceedings appeals from the juvenile court's orders denying Lancaster County Children and Youth Social Service Agency's ("CYS") request to change the children's permanency goals from reunification to adoption.[1] We affirm.
B.B., A.B., and M.B., three girls, were born of K.B.'s ("Mother") relationships with three separate men. B.B.'s father was identified as J.R.; however, A.B.'s and M.B.'s fathers are unknown. None of the men has had any significant contact with their respective daughters. At the time of the June 17, 2010 permanency review hearing, the girls were ages nine, seven, and five, respectively.
CYS first became involved with Mother during her adolescence due to allegations that her father ("Maternal Grandfather") abused her sexually. An indicated sexual abuse report identified Maternal Grandfather as perpetrating the sexual abuse between 1997 and 1999. Maternal Grandfather is a registered sex offender under Pennsylvania's version of Megan's Law with a conviction of indecent aggravated assault for abuses committed against a victim other than Mother.
CYS was reacquainted with Mother during 2001, based upon reports that she was unable to care for her then-newborn daughter, B.B., and because she resided in squalor. During the subsequent years, CYS received additional reports that Mother was unable to satisfy her growing family's needs. Specifically, CYS was concerned about the family's deplorable and cramped living conditions, the children's hygiene, and the family's ongoing association with Maternal Grandfather, including permitting unsupervised contact with the three children while Maternal Grandfather resided with the family.
During 2007, CYS discovered that Mother had been evicted from her apartment and the family was homeless. In addition, *1086 CYS learned that A.B. had significant mental health issues that Mother did not address. In the same year, Mother indicated that she intended to maintain a relationship with Maternal Grandfather, who was then non-compliant with his mandated sexual offender treatment, and she recanted her prior allegations of his sexual abuse. Mother also refused to abide by a CYS safety contract that identified Maternal Grandfather as a threat to the children's safety and required Mother to avoid contact with him. A subsequent investigation by Child Protective Services ("CPS") resulted in an indicated report of sexual abuse against Mother because she permitted Maternal Grandfather, a known sexual abuser, to reside with the children during spring 2008. CPS determined that Mother's actions created an "imminent risk of... sexual abuse or sexual exploitation" under the Child Protective Services Law, 23 Pa.C.S. § 6303(a) and (b). However, since CPS mailed the report to an incorrect address, Mother did not receive the determination and was unable to appeal it.
As CYS believed that Mother continued to permit Maternal Grandfather to have unsupervised contact with her daughters and failed to address the ongoing concerns with the children's hygiene and mental health, the juvenile court adjudicated B.B., A.B., and M.B. dependent on August 13, 2008. CYS was awarded temporary legal custody of the three children. The agency placed B.B. and M.B. together with a foster care family that is a permanent placement resource. A.B. was placed in a specialized foster home with a foster parent who was trained to address her emotional and behavioral issues. That foster home also is a permanent placement option. The initial permanency goal of all three children was reunification with a concurrent goal of adoption. Mother was permitted biweekly hour-long, supervised visitation.
The goals that CYS developed for Mother and implemented in the family service plan ("FSP") and the girls' respective permanency plans included: (1) improve mental health function; (2) adopt and utilize good parenting skills; (3) achieve and maintain financial stability; (4) obtain and maintain adequate housing; (5) demonstrate an ongoing commitment to her daughters; and (6) develop an understanding of sexual victimization in order to address her past victimization and to protect her daughters from abuse. The juvenile court assessed Mother's compliance with the goals and objectives over the course of the dependency proceedings and characterized her compliance with the plan as moderate and her commitment to her daughters as commendable. Trial Court Opinion, 10/5/10, at 14-15.
The juvenile court observed that Mother attended every supervised visitation with her daughters, and her behavior during the visitation was appropriate. Id. at 5, 11. She also was attentive to the children's medical schedule, missing medical appointments only when she had a valid reason. Id. at 12. As it relates to the parenting component, Mother completed the required parent training program and made progress toward successfully implementing the knowledge that she had attained. Id. Similarly, the juvenile court found that Mother participated in the required counseling programs and demonstrated a willingness to broach sensitive subjects when it affected her daughters' safety. Id. at 12.
In addition, Mother completed her goals for income and housing. Id. at 12. Mother is employed fulltime, and the combined income of Mother and her live-in fiancé, M.C., with whom she shares a child unrelated to these matters, is sufficient to satisfy the family's living expenses without outside *1087 assistance. Id. at 12-13. Mother and M.C. rent a three-bedroom home that is adequate for the children. Id. at 12. CYS twice visited the home and characterized the condition of the residence as both "really nice" and "acceptable [but] clutter[ed]". Id. at 10-11.
In relation to Mother's mental health and her ability to address her sexual victimization, the trial court found that Mother completed the mental health evaluation and is continuing with the required counseling. Id. at 6-7, 15. Indeed, Mother not only completed a psychological evaluation with Yury Yaroslavsky, M.D., during July 2008, and participated in a non-offending parent evaluation administered by Triad Treatment Specialists ("Triad") during October 2008, she also agreed to submit to a second mental health evaluation by Jonathan M. Gransee, Ph.D., after the guardian ad litem objected that Dr. Yaroslavsky made his findings without the benefit of the Triad report or the children's psychosexual evaluation. Id. at 7. Dr. Gransee suggested that Mother might suffer from a learning disability, but he was unable to diagnose a specific mental health condition that would have a negative affect on Mother's ability to parent and protect her daughters. Id. Accordingly, he recommended that Mother continue her outpatient counseling. In sum, the trial court determined that Mother completed the training and evaluation portions of goals and attained stable income and housing. Id. at 15. The court concluded that Mother was committed to her daughters and needed only to continue to participate in her mental health counseling, implement her parental training, and maintain stable income and housing. Id.
However, after the children were in placement for approximately two years, CYS eventually found that compelling reasons no longer existed to forgo changing B.B.'s, A.B.'s, and M.B.'s respective permanency goals from reunification to adoption and to prepare to terminate Mother's parental rights. Accordingly, in anticipation of the children's twenty-four-month permanency review hearing, the agency formally recommended to the juvenile court that it change the children's permanency goal to adoption and terminate Mother's biweekly visitation with her daughters. From the agency's perspective, Mother failed to appreciate the risks Maternal Grandfather posed to the children and demonstrated an ongoing inability to complete her parenting, housekeeping, and sexual victimization goals.
Following three evidentiary hearings on March 25, May 6, and June 17, 2010, the trial court entered a permanency review order on August 6, 2010, wherein it denied CYS's request to change the permanency goal to adoption and directed the agency to increase Mother's supervised visitation with the children, explore at-home visitation, and prepare the children for transition home to Mother. Specifically, the juvenile court concluded that Mother completed the goals outlined in her daughters' permanency plans and was continuing with her ongoing mental health counseling and implementing her parenting skills. Id. at 17. The court also found that Mother demonstrated an appreciation for the threat Maternal Grandfather posed to her children and that she possessed the will and means to protect the children. Id. at 18. Moreover, the court also identified a "powerful bond" between Mother and her daughters and found that the children reciprocated Mother's commitment to them. Id. Accordingly, the court concluded that compelling reasons did not exist to change B.B.'s, A.B.'s, and M.B.'s permanency goals from reunification to adoption. Id. at 19.
*1088 The guardian ad litem filed this timely appeal and concurrently filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).
The guardian ad litem presents the following issues for our review:
1. Did the Court err in finding a transition home to be in the best interest of the children?
2. Did the Court err in not changing the goal to adoption after 24 months in placement?
Guardian ad litem's brief at 7. First, the guardian ad litem argues that the record does not support the juvenile court's factual determination regarding the bond between Mother and her daughters. Next, relying upon our holding in In re R.J.T., 990 A.2d 777 (Pa.Super.2010), rev'd, ___ Pa. ___, 9 A.3d 1179 (2010), the guardian ad litem asserts that the juvenile court erred in failing to utilize a mechanical application of the Juvenile Act's time-mandate, which directs the court to focus on the child's needs for permanency and to determine, inter alia, whether compelling reasons exist for CYS to forgo seeking to terminate the parental rights to a child who has been in placement for at least fifteen of the last twenty-two months. See 42 Pa.C.S. § 6351(f)(9). While CYS did not appeal the order denying its petition to change the children's permanency goal to adoption, it filed a brief supporting the guardian ad litem's position.
Our Supreme Court recently reiterated the appropriate standard of review of a juvenile court's permanency determination.
As the Superior Court stated [in In re R.J.T., 990 A.2d 777 (Pa.Super.2010)], the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.
In re R.J.T., ___ Pa. ___, 9 A.3d 1179, 1190 (2010).
Furthermore, as it relates to the precise complaints the guardian ad litem raises herein, we have stated,
Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301-65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.
In re N.C., 909 A.2d 818, 823 (Pa.Super.2006) (citations omitted) (footnotes omitted).
Pursuant to § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, inter alia: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; *1089 and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. In re R.J.T., 9 A.3d at 1186-1187 n. 8 ("In re R.J.T., II"). The best interests of the child, and not the interests of the parent, must guide the trial court. In re S.B., 208 Pa.Super. 21, 943 A.2d 973, 978 (2008). As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re N.C., 909 A.2d at 824 (quoting In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa.Super.2003)).
At the outset, we observe that the guardian ad litem's reliance upon our rationale in In re R.J.T., for the proposition that § 6351(f)(9) compelled the juvenile court to change B.B.'s, A.B.'s, and M.B.'s permanency goal to adoption because the children were in placement for twenty-four months is unavailing because our Supreme Court expressly overruled our holding in that case. In In re R.J.T., this Court reversed a juvenile court's order denying an agency's oral petition to change a dependent child's permanency goal from reunification to adoption. In overruling the trial court, we reasoned, inter alia, that the trial court overlooked the temporal requirement of 42 Pa.C.S. § 6351(f)(9).[2] Moreover, observing that (1) the child had been in placement for twenty-two months; (2) the statutory exceptions to subsection (f)(9) were not applicable; and (3) the parents were not prepared to reunite with the child, we concluded that the trial court abused its discretion in denying the goal change. Id. at 787-788.
The Supreme Court granted the agency's petition for allowance of appeal and reversed, explaining as follows:
"The Superior Court seemingly interpreted [section 6351(f)(9)] to require the trial court to change the goal to adoption if the child had been in care for fifteen of the past twenty-two months and reunification was not imminent.... The Superior Court noted prior caselaw supporting the need for the child welfare agency and the courts to move a child toward adoption if reunification efforts have been unsuccessful, apparently not recognizing that concurrent planning allows an agency to move toward adoption and termination of parental rights while still maintaining a goal of reunification."
In re R.J.T. II, supra at 1188. Our Supreme Court reasoned that subsection (f)(9) was merely one of several factors that the juvenile courts are required to consider pursuant to § 6351(f) in determining the appropriateness of the available placement options. Id. at 1190. Furthermore, the Supreme Court admonished this Court for reweighing the evidence in that *1090 case and failing to demonstrate sufficient deference to the juvenile court's findings of fact and credibility determinations. Id. It then concluded that, in light of all of the relevant factors outlined in § 6351(f), the record supported the juvenile court's decision to deny the petition to change the permanency goal to adoption. Accordingly, it held that this Court erred in re-evaluating the evidence and concluding that the juvenile court had abused its discretion in denying the request.
Mindful of our Supreme Court's authoritative statements regarding both the application of the Juvenile Act's timeline requirements in § 6351(f) and our role during the appellate review of the juvenile court's permanency determination, the guardian ad litem's reliance upon our rationale in In re R.J.T., is inappropriate. Simply stated, a mechanical application of § 6351(f)(9) is improper, particularly where, as here, the juvenile court has fashioned concurrent goals that permit CYS to work toward adoption while retaining the goal of reunification. Id. at 1188. As the legal foundation of the guardian ad litem's position is faulty, no relief is due on the basis asserted.
Next, we address the guardian ad litem's assertion that the record does not support the juvenile court's finding that Mother shared a strong emotional bond with B.B., A.B., and M.B. We conclude that this argument also fails. In explaining its rationale for denying CYS's request for the goal change, the juvenile court considered the significance of the bond that existed between Mother and her daughters. Specifically, the court observed,
The testimony established that there is a powerful bond shared between Mother and the Children, despite the limited opportunities which have existed in which to nourish that bond. The Juvenile Act recognizes the importance of the parent/child bond in healthy human relationships when it directs that the [c]ourt should preserve the unity of the family when possible. The court believed that it is possible to preserve the unity of the family comprised of Mother and the Children in this case and that, in this case, such a course is in the Children's best interest. The court is further of the opinion that the destruction of the parent/child bond as would inevitably flow from a change of goal to adoption (and the concomitant cessation of visits between Mother and the Children) would damage the children in Mother's home.
Trial Court Opinion, 10/5/10, at 18-19. Later, after addressing the guardian ad litem's concerns about the court's decision to initiate the children's transition home based on its finding of Mother's moderate compliance, the juvenile court revisited the importance of Mother's bond with her daughters and concluded,
The Court must focus on the best interest of B.B., A.B., and M.B. As stated above, the most critical factor presented is the bond this Mother has with her Children. The existence of the bond really is not disputed. The Guardian ad litem concedes there is a bond, but believes it one of a dubious nature. Additionally, the Guardian ad litem did not foresee a negative impact upon the children if the children remain in foster care at this time. Mother attends all [of] her visits with the children and has continually asked for increased visits. The Court is convinced Mother will protect her children from her father, [Maternal Grandfather]. Accordingly, the reason for the placement of these children is gone. The Agency has not met its burden to prove by clear and convincing *1091 evidence that the court should change the goal for these children to adoption.
Id. at 23 (footnotes omitted).
Herein, the guardian ad litem challenges the juvenile court's factual findings regarding the existence of a significant parent-child bond. She argues that the testimony that the juvenile court cited in support of its factual finding that a parent-child bond existed between Mother and the three children was taken out of context. She also posits that the juvenile court inflated the importance of the children's statements that they wanted to go home. Likewise, CYS asserts that the children's desire to live with Mother do not provide a sufficient basis to forgo changing the permanency goal to adoption when Mother's ability to ensure their safety remains a concern. However, as we reveal infra, the certified record belies both CYS's and the guardian ad litem's claims.
The testimony adduced during the permanency review hearings sustains the trial court's factual determination that a significant emotional attachment exists between Mother and her respective daughters. Mother's testimony revealed a strong psychological attachment with the children generally. N.T. Review Hearing A.M. Session, 6/17/10, at 41-42. She explicitly stated to the court that the children "keep asking to come home all the time. They just want to be back home." Id. at 43. Similarly, Mother expressed her desire to demonstrate to CYS that she was capable of maintaining her daughters' safety and she complained that the supervised biweekly visitations that CYS administered did not provide an opportunity for her to display her abilities. Id. at 41, 43.
B.B. reciprocated Mother's affection during her in camera interview with the juvenile court. Specifically, B.B. indicated that she likes visiting Mother and wants to go home to live with her. N.T., 2/25/10, at 12. B.B. explained that she enjoyed living with Mother and although she never went to Mother's new residence, she has no anxiety about returning to Mother's care. Id. at 12, 14, 15. She added that she is fond of Mother's fiance and that she would feel safe living in Mother's home. Id. at 14-15.
Likewise, Melinda Biddle, Mother's current and B.B.'s former counselor, confirmed that B.B. desired to return home. Id. at 37. Ms. Biddle is a community counselor employed by T.W. Ponessa & Associates Counseling Services. Id. at 27. She counseled both Mother and B.B. separately for approximately twenty-four sessions between March 2009 and October 2009. Id. at 36-37. During Ms. Biddle's counseling sessions with B.B., the child conveyed a desire to live with Mother. Id. at 37. Ms. Biddle also informally observed Mother visit with B.B. and the two remaining children for five-to-ten-minute periods in the facility's waiting room prior to and following the counseling sessions. Id. at 40, 53. She testified that the children were very excited to see Mother and became emotional when the sessions were over. Id. at 40. Ms. Biddle explained, "They just didn't want to leave, hanging on [Mother's] leg and ... crying and wanting to continue to spend time with her." Id. at 41. During August 2008, Ms. Biddle first recommended that CYS increase the frequency of Mother's visitation. Id. at 38. She eventually recommended unsupervised visitation with an eye toward the children's ultimate reunification with Mother. See Mother's Exhibit A. However, CYS rejected Ms. Biddle's input, and within two months of the counselor's initial recommendation for increased contact with the children, CYS removed B.B. from Ms. Biddle's therapy. N.T., 2/25/10, at 53-54.
Margaret Schmidt, the CYS caseworker assigned to this case since September 22, *1092 2009, testified throughout the various evidentiary hearings. Ms. Schmidt indicated that Mother demonstrated care and concern for B.B., A.B., and M.B., and that Mother has advocated for the children's safety in the past by raising her concern for the children's safety in foster care. N.T., 3/25/10, at 27-28. Ms. Schmidt also informed the court that Mother attended every supervised visitation with her daughters since the children have been in placement and attended most of their medical appointments unless a scheduling conflict existed with her employment. Id. at 7, 78; N.T., 5/6/10, at 24, 65; N.T., 6/17/10, at 32. Ms. Schmidt supervised the biweekly visitation, and she observed that the children were happy to see Mother, enjoyed the time they spent with her, and vied for her attention. N.T., 3/25/10 at 8-9, 90; N.T., 5/6/10, at 47.
Ms. Schmidt also addressed a comprehensive diagnostic evaluation and report that Children's Home of York ("CHOY") prepared for A.B. As it relates to A.B.'s relationship with Mother, the CHOY report indicated that A.B. was excited to see Mother during their evaluative sessions and wanted to return home. N.T., 3/25/10, at 82-83, 86. The report also stated that Mother was involved in the diagnostic evaluation and that her behavior during the visitation sessions was appropriate and consistent. Id. at 85.
In contrast to the evidence supporting the trial court's finding that a significant bond exists between Mother and her daughters, CYS adduced countervailing evidence during the hearing that the children's attachment to Mother and their desire to return home was superficial. Specifically, when the inquiry was posed to B.B. during the in camera examination, she informed the court that she enjoys attending the supervised visitation with Mother because she gets to see her other sisters. N.T., 2/25/10, at 12. B.B. also testified that she was looking forward to returning home because it would permit her to re-enroll in gymnastics and see her infant sister and the family's collection of pets. Id. at 12, 16. Similarly, the guardian ad litem pointed out that although the CHOY report revealed that A.B. was adamant about living with Mother, she also listed several other people with whom she would like to reside. See Agency Exhibit 1, 2/25/10, Appendix A at 10. The guardian ad litem also opined that A.B.'s diagnosis of reactive attachment disorder precluded A.B. from forming strong bonds. Hence, citing the circumstances surrounding B.B.'s and A.B.'s assertions that they want to live with Mother, the guardian ad litem contends that the statements are not indicative of a strong parent-child bond. We disagree with the guardian ad litem's premise that the context and circumstances of the children's statements negated the evidence of the parent-child bond that Mother shares with her daughters. Hence, we find that the certified record supports the juvenile court's determination that a strong emotional bond exists.
Likewise, as it relates to the agency's concern that Mother is unable to protect B.B., A.B., and M.B. from Maternal Grandfather, the certified record also provides a firm foundation for the juvenile court's finding that Mother demonstrated an appreciation for the threat Maternal Grandfather posed to her children. Mother repeatedly testified during the June 17, 2010 hearing that she has had no contact with Maternal Grandfather for approximately two years and has no desire to have any contact with him in the future. N.T. Review Hearing A.M. Session, 6/17/10, at 25, 29, 42, 49, 53. In fact, Mother's family members do not remain in contact with Maternal Grandfather, who is currently incarcerated for violating the reporting requirements of his probation. Id. at 51, 53.
*1093 Moreover, Mother explained that prior to Maternal Grandfather's incarceration, she obtained a written stipulation from him, witnessed by his parole officer, Derek Warner, stating that he would not attempt to contact her daughters or come near her residence. Id. at 18. Mother testified that she spoke with the local police department about Maternal Grandfather and they advised her that they would arrest him for trespass or harassment if he attempted to come near her property. Id. In addition, Mother attempted, albeit unsuccessfully, to protect her daughters by having a Protection from Abuse order entered against Maternal Grandfather. Id. at 49.
Mother also explained that her therapy with Ms. Biddle and the discovery of a diary she maintained during her adolescence provided the needed confirmation that Maternal Grandfather had, in fact, abused her sexually as a child. Id. at 24-25. She conceded that in her prior emotional state, it was difficult for her to recall what had occurred during her childhood. Id. at 25-26. She further elucidated that due to counseling she received during 2005, she repressed the episode and even doubted the allegations that she leveled against her father. Id. at 26. Moreover, she testified that the religious counseling she received to cope with the sexual assault encouraged her to forgive Maternal Grandfather and to make amends with him in order to be saved. Id. Thus, in the past, her counselors encouraged her to maintain contact with Maternal Grandfather.
Again, Ms. Biddle's testimony during the hearings bolstered Mother's position. Ms. Biddle testified that Mother addressed her sexual victimization during their therapeutic sessions, wherein she discussed Maternal Grandfather's sexual abuse, acknowledged the importance of preventing any contact between him and her daughters, and described the mechanisms she could use to ensure that he will not have access to the children. N.T., 2/25/10, at 44. Based on those factors, Ms. Biddle opined that Mother was capable of protecting the children. Id. at 40, 43-44.
CYS countered the foregoing testimony by disputing Mother's credibility generally, assailing Ms. Biddle's professional credentials, and challenging the counselor's unrestrained reliance upon Mother's veracity. N.T., 3/25/10, at 11-15, 55, 97. In contrast to Ms. Biddle, Ms. Schmidt strongly believed that Mother was incapable of comprehending the risk that Maternal Grandfather posed to B.B., A.B., and M.B. and that Mother would not protect her daughters from harm. Id. at 18, 25. However, the juvenile court made credibility determinations in Mother's favor and against CYS's witnesses in reaching its determination.
Nevertheless, notwithstanding the juvenile court's credibility determination, CYS and the guardian ad litem continue to assert that Mother is unable to protect her daughters without the agency's intervention. Essentially, CYS and the guardian ad litem request that we reweigh the evidence and the juvenile court's assessment of credibility in order to reach a different conclusion. However, mindful of our standard of review, we decline to infringe upon the juvenile court's credibility determinations that are supported by competent evidence in the certified record. See In re R.J.T. II, supra at 1190. While we observe that CYS adduced evidence during the permanency review hearings that could have supported a decision to change the children's permanency goals to adoption, the juvenile court, as the ultimate finder of fact, reached a contrary conclusion that we cannot re-evaluate based upon a cold record. Id. As the certified record supports *1094 the juvenile court's assessment of the relevant factors outlined in 42 Pa.C.S. § 6351(9), we will not disturb its decision to deny CYS's petition to change B.B.'s, A.B.'s, and M.B.'s respective permanency goals from reunification to adoption and to prepare the children for their transition home.
Orders affirmed.
NOTES
[*] Retired Senior Judge assigned to the Superior Court.
[1] The matter is properly before this Court. An order granting or denying a goal change in a dependency proceeding is appealable. In re H.S.W.C.-B., 575 Pa. 473, 836 A.2d 908 (2003). Moreover, since the juvenile court's June 17, 2010 orders were not entered on the docket until August 6, 2010, the appeals were timely.
[2] Specifically, 42 Pa.C.S. § 6351(f)(9) provides as follows:

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:
(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or
(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.