J-S34031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.M.-G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: H.I.G., NATURAL FATHER | No. 1921 MDA 2015 |

Appeal from the Order Entered October 5, 2015,
in the Court of Common Pleas of Centre County, Juvenile
Division, at No(s): CP-14-DP-0000022-2013

| | |
|---|---|
| IN THE INTEREST OF: H.M.-G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: H.I.G., NATURAL FATHER | No. 1922 MDA 2015 |

Appeal from the Order Entered October 5, 2015,
in the Court of Common Pleas of Centre County, Juvenile
Division, at No(s): CP-14-DP-0000026-2013

| | |
|---|---|
| IN THE INTEREST OF: L.I.M.-G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: H.I.G., NATURAL FATHER | No. 1923 MDA 2015 |

Appeal from the Order Entered October 5, 2015,
in the Court of Common Pleas of Centre County, Juvenile
Division, at No(s): CP-14-DP-0000021-2013

BEFORE:  PANELLA, STABILE, and JENKINS, JJ.

MEMORANDUM BY JENKINS, J.:                    **FILED MAY 24, 2016**

H.I.G. ("Father") appeals from the orders entered October 5, 2015, in the Court of Common Pleas of Centre County, which ended reunification services with respect to Father's three minor sons, H.M.-G, born in January of 2010, and twins L.I.M.-G. and M.M.-G., born in April of 2011 (collectively, "the Children").  After careful review, we affirm.

On August 26, 2013, Centre County Children and Youth Services ("CYS") filed dependency petitions with respect to L.I.M.-G. and M.M.-G. In its petitions, CYS alleged that Mother had been incarcerated on or about July 8, 2013. Dependency Petitions (L.I.M.-G. and M.M.-G.), 8/26/2013, at 4, ¶ 5, 7. In addition, Father was unable to care for L.I.M.-G. and M.M.-G. because he was residing in a halfway house in Philadelphia, and because he had a history of committing violent crimes. *Id.* at 4-5, ¶ 4, 6, 8. L.I.M.-G. and M.M.-G. resided with various friends and family members until Mother signed a voluntary placement agreement on July 31, 2013, and they entered foster care. *Id.* at 4-5, ¶ 5-6. L.I.M.-G. and M.M.-G. were adjudicated dependent by orders entered September 6, 2013.

On October 2, 2013, CYS filed an application for emergency protective custody of H.M.-G. CYS averred that H.M.-G. was in the care of his paternal grandmother, and that "she does not feel that she could protect the child from the father, [Father] …." Application for Emergency Protective Custody, 10/2/2013, at 3. An order for emergency protective custody was entered that same day. A shelter care hearing took place on October 4, 2013, after which an order was entered indicating that H.M.-G. would remain in foster care. CYS filed a dependency petition regarding H.M.-G. on October 7, 2013, and H.M.-G. was adjudicated dependent by order entered October 11, 2013.

On October 30, 2013, Father and Mother were offered reunification services through Family Intervention Crisis Services ("FICS"). N.T., 4/24/2015, at 4. Mother made significant progress toward reunification, and it was anticipated that H.M.-G. would be placed in her care by the end of February of 2015. *Id.* at 5-8, 46. However, FICS staff discovered that Mother was dating a man named J.K., who had "a pretty extensive criminal record," and that J.K. had spent time at Mother's home during an unsupervised overnight visit with H.M.-G. *Id.* at 6-14. As a result of this incident, Mother's unsupervised visits were ended. *Id.* at 11, 14-15. Subsequently, FICS learned that J.K. was a wanted fugitive, and that he was apprehended by police at Mother's residence, while "hanging off of the banister of the fire escape out back." *Id.* at 15. A permanency review hearing was held on April 24, 2015, and reunification services were ended with respect to Mother only by orders entered April 27, 2015.

The trial court conducted an additional permanency review hearing on August 5, 2015, September 14, 2015, and October 1, 2015.[1] Following the hearing, on October 5, 2015, the court entered the subject permanency review orders. In its orders, the court indicated that the Children's permanent placement goal would remain "return to parent or guardian," with

_____

[1] The transcript contained in the certified record states that the third day of the hearing took place on October 14, 2015. Our review of the record indicates that this date is incorrect, and that the third day of the hearing actually took place on October 1, 2015.

a concurrent placement plan of adoption. Permanency Review Order, 10/5/15, at 2. The court then attached findings of fact, in which it ordered that reunification efforts be ended with respect to Father.[2] *Id.* at Findings of Fact ¶ 7. The court reasoned that Father has failed to develop appropriate parenting skills, despite being offered extensive reunification services, and that Father will not be able to develop these skills within a reasonable period of time. *Id.* at Findings of Fact ¶ 3-4. The court also indicated that visits with Father have a negative impact on the Children's behavior, and that continuing reunification efforts will only serve to create uncertainty and confusion for the Children. *Id.* at Findings of Fact ¶ 1. The court directed that CYS "go forward with their plans to provide these children with the stability and permanent family situations required by law." *Id.* at Findings of Fact ¶ 7. Father timely filed notices of appeal from the court's permanency review orders on October 19, 2015, along with concise statements of errors complained of on appeal.

Father now raises the following issue for our review.

> Did the [trial c]ourt err in ending reunification services for Father where evidence was presented, by both CYS and Father, that sufficient progress had been made by Father towards alleviating the circumstances which necessitated the original placement of the children and that said progress warranted continuing reunification services with Father?

Father's brief at 22.

---

[2] It is not clear why the trial court would end reunification services without changing the Children's permanent placement goals to adoption. The court did not address this issue in its opinion.

- 4 -

Before addressing Father's claim, we observe that both CYS and the Children's guardian *ad litem* have filed briefs in this Court, in which they argue that the subject permanency review orders are not final orders, and that Father's appeal should be quashed as interlocutory. Thus, we first will consider whether the October 5, 2015 permanency review orders were properly appealable.

It is well-settled that, "[a]n appeal lies only from a final order, unless permitted by rule or statute." ***Stewart v. Foxworth***, 65 A.3d 468, 471 (Pa.Super.2013). Generally, a final order is one that disposes of all claims and all parties. ***See*** Pa.R.A.P. 341(b). A permanency review order is final when entered if that order changes a child's permanency goal, or denies a request that the permanency goal be changed. ***See In re H.S.W.C.-B.***, 836 A.2d 908, 911 (Pa.2003) ("An order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered."). This Court has explained that goal change orders are considered final and appealable because, *inter alia*, they allow courts and child protective services agencies to "give up" on parents and end the provision of reunification services.[3] ***See In the Interest of M.B.***, 565 A.2d 804 (Pa.Super.1989), *appeal denied*, 589 A.2d 692 (Pa.1990).

---

[3] We acknowledge that our Supreme Court has questioned, in dicta, whether goal change orders allow an agency to end reunification services. ***See In re R.J.T.***, 9 A.3d 1179, 1186 n.9 (Pa. 2010) ("Our research . . . discloses nothing in Federal or Pennsylvania statutory law or this Court's jurisprudence specifically stating that a decision to change a permanency

After carefully examining the October 5, 2015 permanency review orders, we conclude that the orders were final, and that Father's appeal should not be quashed. As both CYS and the Children's guardian *ad litem* have stressed, the trial court's orders did not expressly change the Children's permanent placement goals. However, the subject orders did exactly what goal change orders would do, by ending reunification services and directing CYS to focus its efforts on finding a permanent home for the Children. For the same reasons that goal change orders are final and appealable, the subject permanency review orders must also be final and appealable. To conclude otherwise would elevate form over substance, and would allow the trial court to enter something that is a goal change order in all but name, while evading the appellate review to which these orders are normally subject. Therefore, we will treat the October 5, 2015 permanency review orders as goal change orders, and we will proceed to address the merits of Father's appeal. We do so mindful of the following.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

plan goal to adoption permits an agency to stop providing services to the parents."); *see also In re L.J.*, 79 A.3d 1073, 1081 (Pa.2013) ("The doctrine [of *stare decisis*] only applies to issues actually raised, argued and adjudicated, and only where the decision was necessary to the determination of the case. The doctrine is limited to actual determinations in respect to litigated and necessarily decided questions, and is not applicable to *dicta* or *obiter dicta*.").

- 6 -

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa.2010).

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super.2011) (citations and quotation marks omitted).

In his brief, Father argues that he has made significant progress toward remedying the conditions that caused the Children to be placed in foster care. Father's brief at 29-37. Father stresses that he has appropriate housing and is gainfully employed, and that he has successfully completed a parenting education and support group. *Id.* at 34-36. Father contends that the trial court erred by ending reunification services, and he requests that services be reinstated. *Id.* at 38. We disagree.

On August 5, 2015, CYS presented the testimony of FICS family reunification counselor, Hannah Hartswick. Ms. Hartswick testified that Father began participating in reunification services in February of 2014.

N.T., 8/5/2015, at 4. Initially, Father and Mother agreed to work toward reunification together, despite the fact that Father resided a significant distance away from Mother in Philadelphia. *Id.* at 12-13. Father's participation in the reunification process was minimal during this time. *Id.* From about February of 2014 until February of 2015, Father limited his participation to providing financial support to Mother, and occasionally attending visits with the Children. *Id.* at 5, 12. During that year, Father attended nineteen out of the sixty visits that were offered to him. *Id.* at 12. During those visits that Father did attend, Ms. Hartswick stated that Father "was often sleeping, he tended to ignore negative behaviors, and he failed to utilize discipline." *Id.*

Ms. Hartswick explained that Father requested individual reunification services in February of 2015. *Id.* at 11. Ms. Hartswick acknowledged that Father's participation in the reunification process improved significantly since that time, in that Father attended fifteen out of the twenty visits that were offered to him. *Id.* at 35. In addition, Father displayed "a lot of love," and made "a lot of attempts to take the feedback that was being provided and apply it." *Id.* at 51-52. However, despite months of intensive reunification services, Ms. Hartswick believed that Father has failed to develop the parental capacity necessary to ensure the safety and well-being of the Children if they were placed in his care. *Id.* at 29.

Ms. Hartwick stated that Father was provided with parenting instruction during each of his visits with the Children, but that Father continued to display the same troublesome behaviors over and over again. *Id.* at 15. For example, during a visit with the Children on June 3, 2015, Father attempted to discipline the Children by threatening to withhold food from them. *Id.* at 16. Father was informed that threats to withhold food were not an appropriate form of discipline. *Id.* at 16-17. Despite this instruction, Father continued to make similar threats, and would sometimes ignore the Children's requests for food or drink.[4] *Id.* There also were repeated safety concerns observed during Father's visits, including difficulty installing car seats into a CYS van, and difficulty supervising the Children in a parking lot. *Id.* at 20-22.

In addition, Ms. Hartswick expressed concern that the Children's emotional state would be severely impacted if reunification services were to continue. *Id.* at 53. Ms. Hartswick explained that H.M.-G. in particular has been struggling with the reunification process, and that he sometimes engages in problematic behaviors, such as "episodes of destruction, threatening to hurt himself or others, swearing, spitting, screaming, [and] biting." *Id.* at 9-10. These behaviors occur "especially following visits," and L.I.M.-G. and M.M.-G. are starting to display some of the same habits. *Id.*

---

[4] These threats included statements like "if you don't knock it off, you're not going to get lunch," and "no, you're going to wait another half hour before you get a drink or get food." N.T., 8/5/2015, at 16.

at 10-11. Ms. Hartwick feared that transporting H.M.-G. to visit Father at his home in Philadelphia would be especially harmful. *Id.* at 32, 40-41. Ms. Hartwick explained this concern as follows.

> …. He currently is creating fantasies of when I go to see dad, when I go to live with dad, we're going to go on the submarine in the Philly lake, and we're going to go to these different places. And my dad's house is like this and when I live with my dad, it means I'm going to go home to dad's house. And he makes a lot of these statements. His emotional well[-]being is very fragile right now. And he would have a very good understanding of the fact that we were going to Philadelphia and that this was dad's home. And if he was not at a point where it was time to transition him into that home, trying to bring him back and forth would be very detrimental to him.

*Id.* at 40-41.

Ms. Hartswick further reported that the Children display "extreme aggression" during visits with Father, which includes "fighting, flipping over furniture, screaming, running away, and at times nearly, … getting out of the building …." *Id.* at 20. Ms. Hartswick observed that these behaviors continue until the Children's foster parents arrive near the end of Father's visits, at which point the behaviors cease "almost immediately." *Id.* at 24. Ms. Hartswick opined that the Children have a strong attachment to their foster parents and foster sibling, and that they are thriving in their current foster home. *Id.* at 9.

Thus, the record supports the trial court's finding that Father lacks appropriate parenting skills, and that Father will not be able to develop these skills within a reasonable period of time. Moreover, the reunification process

has had a deleterious effect on the Children. It was proper for the court to conclude that the best interest of the Children would be served by ending this process, and allowing the Children to enjoy the benefits of a permanent and stable home.

Accordingly, because we conclude that the trial court did not abuse its discretion by ending reunification services, we affirm the permanency review orders entered October 5, 2015.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2016