J. S44043/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF:  A.V., MINOR    :    IN THE SUPERIOR COURT OF
    :       PENNSYLVANIA
    :
APPEAL OF:  J.V., NATURAL FATHER    :    No. 633 WDA 2019

Appeal from the Order Entered March 22, 2019,
in the Court of Common Pleas of Clarion County
Civil Division at No. CP-16-DP-0000031-2018

BEFORE:  SHOGAN, J., McLAUGHLIN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:    **FILED SEPTEMBER 23, 2019**

J.V. ("Father") appeals from the March 22, 2019 permanency review order entered in the Court of Common Pleas of Clarion County, Juvenile Division, that changed the placement goal of A.V., female child, born in July 2014 ("Child"), from reunification to adoption.  We affirm.

At the outset, we note that the natural mother of A.V. is S.D. ("Mother"). Mother is also the natural mother of R.M., female child, born in September 2011; B.M., male child, born in October 2012; Z.M., female child, born in December 2016; and X.M., male child, born in October 2015.  At the time of the permanency review hearing, Mother was married to C.M., who is the natural father of R.M., B.M., Z.M., and X.M.  The record is unclear, however, as to when Mother and C.M. married, but the record indicates that the marriage occurred after Child's birth.  (Notes of testimony, 3/22/19 at 109.) The record also indicates that prior to Child's dependency, Child lived with

Mother, C.M., and her four half-siblings. The record is clear that Child never lived with Father and that between Child's birth and her dependency, Father had "a few months" of shared partial custody of Child due to Father's numerous incarcerations. (*Id.* at 116-117.) The record further reveals that Mother and C.M. consider C.M. to be Child's father. Indeed, C.M. testified that Child calls him "dad." (*Id.* at 90.)

We glean the following from the record and the trial court's opinion: Clarion County Children and Youth Services ("CYS") became involved with Mother and C.M. in 2013, which was prior to Child's birth. The record indicates that at some point in 2016, Mother and C.M. placed Child and her half-sibling, X.M., voluntarily with Mother's friend due to Mother's incarceration, lack of proper housing and financial means, and the general inability of Mother and C.M. to care for Child and X.M.[1] Nothing in the record indicates that Father opposed the placement. In fact, the record indicates that Father was incarcerated at the time of the placement and then was intermittently incarcerated through January 2019. (*Id.* at 115-116.) On October 29, 2018, while in the custody of Mother's friend, CYS received an emergency call that two young children, later identified as Child and X.M., were outside in 40-degree weather without supervision or proper clothing. A New Bethlehem police officer took Child and X.M. into protective custody. An emergency

---

[1] We note that Mother and C.M. also voluntarily placed B.M., R.M., and Z.M. with Mother's sister at the same time and for the same reasons. (Trial court opinion, 5/21/19 at 1.)

shelter-care hearing was held on November 1, 2018, and Child and X.M. were placed in foster care together. The trial court adjudicated Child and X.M. dependent by order entered November 16, 2018, and continued foster-care placement. On January 25, 2019, CYS filed a petition seeking to change Child's goal from reunification to adoption.

At the permanency review hearing, Child's caseworker, Mary Jo Milford, testified that Father has not met his goal of providing basic needs for Child. (*Id.* at 15.) Ms. Milford further testified that Father failed to make himself available for an interview so that she could determine whether he has met his goal of abstaining from criminal activity. (*Id.*) Ms. Milford also stated that Child does not have a strong bond with Father. (*Id.* at 16-17.) Brock Morgan, human resource specialist for Justice Works Youth Services, testified that Father cancelled a "large amount" of scheduled visits with Child, mainly due to lack of transportation. (*Id.* at 61.) Mr. Morgan testified that Father's last-minute cancellations "are not good for [Child]." (*Id.* at 68.)

Father testified that he does not have a driver's license due to outstanding fines. (*Id.* at 108.) Father has outstanding fines in Florida of approximately $500 and outstanding fines in Pennsylvania of approximately $4,000. (*Id.* at 119.) Father has been convicted of forgery, child endangerment, two simple assaults, and retail theft. (*Id.* at 108) The child endangerment conviction stemmed from Father's selling marijuana while children were in his car. (*Id.* at 109.) Since Child's birth, Father has been

incarcerated four times. (*Id.* at 117.) The record reflects that Father's latest term of incarceration ended in January 2019. (*Id.*) At the time of the hearing, Father was on probation. (*Id.* at 109.) Although Father had seen Child one week before the hearing, the record indicates that the March 15, 2019 visit was the first time Father had seen Child since mid-January 2019. (*Id.* at 112-113.) When Father visits with Child, he testified that he tries "to play with her and have a good time" and wants Child "to have a good time." (*Id.* at 115.) Mr. Brock testified that Father's interactions with Child are "more like two friends playing" which "goes back to the question about parenting." (*Id.* at 69.) With respect to employment, Father works as a contractor and because that work is dependent on good weather, Father testified that he does "side jobs" and is searching for "more stable" employment. (*Id.* at 113-114.)

At the conclusion of the permanency review hearing, the trial court entered the order that changed Child's goal from reunification to adoption.[2] Father filed a timely notice of appeal, together with a statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(a)(2)(i). Thereafter, the trial court filed its Rule 1925(a)(2)(ii) opinion.

Father raises the following issues for our review:

> 1. Did the [trial] court abuse its discretion and err as a matter of law in failing to consider all the factors in changing the goal from reunification to adoption?

---

[2] We note that at the same hearing, the trial court entered orders changing the goals of Child's half-siblings from reunification to adoption.

2.      Did the [trial c]ourt fail to find that [CYS] did not properly offer services to Father?

3.      Did the [trial c]ourt fail to inquire and find that Father is ready, willing, and able to care for [C]hild?

Father's brief at 4.

. . . [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.  Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

The Juvenile Act governs proceedings to change a child's permanency goal.  *See* 42 Pa.C.S.A. §§ 6301-6375.  When considering a goal-change petition, trial courts must apply the following analysis:

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*:   (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety. [. . .]

The best interests of the child, and not the interests of the parent, must guide the trial court.  As this Court held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa.Super. 2011) (citations and quotation marks omitted).

Father first claims that the trial court "did not inquire into [his] completion of the goals of the permanency plan" and merely made "generalized" findings as to Mother, Father, and C.M. (Father's brief at 16.) Father then sets forth excerpts from the hearing transcript and the trial court's opinion in an effort to show discrepancies and convince this court to reach a different result. For example, Father states that the trial court found in its opinion that Father has no driver's license, but that Father testified that "he was in the process of restoring it and given more time . . . he could have accomplished that." (*Id.* at 17 (record references omitted).) By way of further example, Father states that the trial court found that he is presently on probation, but that Father testified that "his probation was ending April 19 or 20, 2019, about one month from the time of the hearing." (*Id.* (record references omitted).) In so doing, Father asks this court to disregard the trial court's findings-of-fact as to Father. Our scope of review in child dependency cases, however, "is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court." *In the Interest of J.G.*, 984 A.2d 541, 546 (Pa.Super. 2009). We give great weight to the trial court's findings-of-fact because it is in the best position to observe and rule upon the credibility of the witnesses. *Id.* Where, as here, competent evidence supports the trial courts findings, we will not overrule those findings. *See id.*

Father next claims that the trial court erred by failing to find that CYS "did not properly offer services to Father" so that he could finalize his permanency plan. (Father's brief at 18.) Father claims that CYS "did not put forth a good faith effort in making services available to [Father] as was evidenced by the lack of interaction with [Father] and with [CYS's] witnesses' lack of information about [Father]." (*Id.* at 19.)

> Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. By requiring only reasonable efforts to reunify a family, the statute recognizes that there are practical limitations to such efforts. It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a reasonable effort towards reunification. This [c]ourt has stressed that the agency is not expected to do the impossible and is not a guarantor of the success of the efforts to help parents assume their parental duties.

*In re C.K.*, 165 A.3d 935, 942 (Pa.Super. 2017) (citations and quotation marks omitted).

The record reflects that since Child's birth, Father has been incarcerated on four occasions. Indeed, Father testified that due to his multiple incarcerations, he has only had partial physical custody of Child "for a few months" since her birth in July 2014. (Notes of testimony, 3/22/19 at 116.) With respect to Father's goals, the dependency adjudication order required Father to meet regularly with CYS, participate in all recommended services, and to regularly visit Child. (Order of adjudication and disposition, 11/16/18

at 1.) Caseworker Milford testified that she had been unable to reach Father, that Father made no effort to get in touch with her, and that Father never made himself available for an interview. (Notes of testimony, 3/22/19 at 15-16.) Although the record is silent as to whether CYS recommended services to Father, it can be reasonably inferred that Father's failure to get in touch with CYS and make himself available made it impossible for CYS to help Father. Additionally, although Father's latest term of incarceration ended in January 2019, Father testified that he had only visited with Child once in mid-January and once on March 15, 2019. (*Id.* at 116-117.) Indeed, Mr. Morgan testified that Father missed a "large amount" of scheduled visits with Child and that Father's last-minute cancellations were not good for Child. (*Id.* at 61, 68.) Once again, competent evidence supports the trial court's findings, and we decline the invitation to disturb those findings on appeal. *See In the Interest of J.G.*, 984 A.2d at 546.

Father finally complains that the trial court "failed to inquire and find that Father is ready, willing, and able to care for the Child." (Father's brief at 20.) The record, however, demonstrates that the trial court heard testimony from Ms. Milford, Mr. Morgan, and Father regarding Father's goals and the progress, or lack of progress, that he has made towards meeting those goals. In his brief, Father rehashes the testimony in an effort to convince this court to reach a different result. Our standard of review, however, requires this court to accept the trial court's findings-of-fact and credibility determinations

where, as here, they are supported by the record. **See In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). We discern no abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/23/2019