J-A29039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: H.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.C., MOTHER | |
| | No. 972 WDA 2025 |

Appeal from the Order Dated June 13, 2025
In the Court of Common Pleas of Blair County
Juvenile Division at CP-07-DP-0000017-2024

| | |
|---|---|
| IN THE INTEREST OF: K.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.C., MOTHER | |
| | No. 973 WDA 2025 |

Appeal from the Order Dated June 13, 2025
In the Court of Common Pleas of Blair County
Juvenile Division at CP-7-DP-000148-2024

BEFORE:  OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED:  January 21, 2026**

F.C. (Mother) appeals from the orders changing the permanency goals of her two younger children, H.M. and K.M. (collectively, Children), from reunification to adoption.  We affirm.

H.M. was born in December 2021, and K.M. was born in September 2023.  On February 21, 2024, the Blair County Office of Children, Youth and Families (CYF) obtained emergency custody of Children, as well as their two

teenage siblings, N.M. and Ka.M. CYF had received information about "substance abuse (methamphetamines) and domestic violence in the presence of [Children]." Order for Emergency Protective Custody, 2/21/24, at 1. When a CYF caseworker went to the home, "it was discovered that [Children] were present and there were syringes laying out that were accessible to [C]hildren." *Id.* Mother tested positive for methamphetamines, admitted to using methamphetamines, and "also confirmed that she was currently on probation." *Id.* After obtaining emergency custody of Children, CYF placed them with D.E. (Foster Mother) and R.E. (Foster Father) (collectively, Foster Parents).[1]

On March 1, 2024, Children were adjudicated dependent with a goal of reunifying with Mother. Order, 3/1/24, at 4. The court ordered Mother to comply with services to assist her in refraining from drug use and criminal activity, and to ensure that her home was safe and habitable. *Id.* at 5-6. The court held an initial permanency review hearing on May 29, 2024. At that time, Mother was incarcerated. The court found that Mother had made minimal progress toward reunifying with Children, and that Children "were doing very well" with Foster Parents. *See* Order, 8/30/24, at 6. The court held additional permanency review hearings on August 16, 2024, November 13, 2024, and February 5, 2025, and continued to conclude that Mother was not progressing toward reunification with Children.

---

[1] On March 13, 2025, Children's older sister, N.M., was also placed in the pre-adoptive home of Foster Parents.

In May 2025, CYF requested that Children's permanency goals be changed to adoption. The court held hearings on May 22, 2025 and June 12, 2025. At the time of the May 22, 2025 hearing, Children had been in placement for more than 15 months. CYF introduced filings, evidence and exhibits from prior proceedings. CYF also presented testimony from Hollidaysburg Borough Police Sergeant Richard Oldham and CYF caseworker Dawn Gardini.

Sergeant Oldham testified that shortly after Children were adjudicated dependent, Mother was incarcerated in Blair County Prison for violating her probation. N.T., 5/22/25, at 12-13. He relayed that while Mother was incarcerated, methamphetamine and suboxone were discovered in her sock, and as a result, Mother incurred additional criminal charges. *Id.* at 13-14.

Ms. Gardini testified that despite the additional charges, Mother was released from the Blair County Prison to inpatient rehab on March 5, 2025. *Id.* at 34. Mother was in rehab until May 1, 2025, when she entered a residential recovery program at Sojourner House. *Id.* at 35-36. Although Sojourner House permits children under the age of 12 to live with residents, Ms. Gardini testified that CYF "was not willing to send" Children to Sojourner House. *Id.* at 36-37. She explained that Mother "was just new to the Sojourner program," and although Mother was sober, "she was sober because she had been in prison." *Id.* at 37. Ms. Gardini observed that "recovery is a lifetime thing." *Id.* at 69.

Ms. Gardini also testified that Children were "situated" with Foster Parents, who are an adoptive resource. *Id.* at 37. Ms. Gardini described H.M. as "now speaking, she's calmed down a lot, [and] she's in school." *Id.* She added that K.M. was "doing really well, and now that [Children's older sister, N.M., was in the home,] they're all together [and doing well]." *Id.*

Mother presented testimony from the Sojourner House service coordinator, Stephanie Crowe. Ms. Crowe confirmed that Mother had been living at Sojourner House for several weeks. She described Sojourner House as providing "long-term care" for six to nine months, where "clients have their own apartments[, and] learn how to be independent and take care of their kids but also hav[e] 24-7 support as well." *Id.* at 85. Ms. Crowe testified that Mother was participating in services and drug testing, which had yielded negative results. *Id.* at 89. She explained that insurance pays for the level of care provided by Sojourner House, and "there's no opportunity for [Mother to obtain] employment." *Id.* at 93. Ms. Crowe stated, "at Phase One, where [Mother] is, she does not leave the building by herself. She can go to medical/dental appointments, things of that nature, but even the last appointment she went to, I was there with her the entire time." *Id.* at 103.

At the June 12, 2025 hearing, Mother testified that she was still residing at Sojourner House. N.T., 6/12/25, at 23-24. At that time, Children were visiting Mother every other week. *Id.* at 18-19. Mother explained:

> [Sojourner House] is a big house … and it has … apartments, one through sixteen. I am all the way up in sixteen. So all day we spend together downstairs, we go down for meds and the moms

- 4 -

[with kids] bring [their] kids down, take meds, we go out back with the kids, and come back in and get breakfast. Then we go back down and have group, then we go back to our room and get ready with the kids. Sometimes we have outside group, sometimes we just walk to the park, sometimes we go to [Narcotics Anonymous], all of it[,] you [can] take your kids with you.

***

[O]n Friday, I [will advance to] phase 2, [and] you have to walk with the other phase two's. [W]e are not allowed out of the building by ourselves, we either go with other phase two's or a worker. It's … a daily schedule. We have apartment time which is three to five, which is family time. If [Children are visiting], I will go back with them and we will eat and then come back down for group. The church comes in some days, they have [Narcotics Anonymous], [Alcoholics Anonymous] come in sometimes[,] and then there [are] other program[s] that come and help us do things with the kids[,] so it helps us learn….

*Id.* at 23-24.

Mother testified to her belief that Sojourner House was the best program for her and her best opportunity to reunite with Children. *Id.* at 30. Mother reiterated that she wanted Children to live with her at Sojourner House. *Id.* She expressed her love for Children and opposition to changing their permanency goals to adoption. *Id.* at 34. Mother stated, "I know that they are in a really good house and they have their sister[, N.M.,] with them. But I am their mother and they are happy with me and I do take care of them. I just have a disease." *Id.*

N.M., who was 15 years hold at the time of the hearing, testified that Foster Parents were "very great." *Id.* at 49. N.M. expressed her desire to be

adopted by Foster Parents, and said that she did not want "to do the whole reunification thing." *Id.* at 53-54. N.M. explained that for her and Children,

> [Mother's home] was definitely really not, like stable[, and Children have progressed] from before to now. [H.M.] is in school and she talks and she's doing a lot better and she completely refers to [Foster Parents] as her parents and she is doing very well in school, she plays. … [K.M. has] a guy that comes in[, who] helps with his speech and stuff…. [Children] are doing a lot, [and] I can see their progress.

*Id.* at 55-56. N.M. noted that Foster Parents "have had [K.M.] longer than [Mother]," and "are all [Children] know." *Id.* at 56. N.M. opined that "it is so much better if [Children] stay [with Foster Parents, where] they are doing good and it is so beneficial, the progress that is being made[,] it is showing that they are doing well compared to before." *Id.* at 58.

After hearing the evidence, the court took judicial notice of the prior dependency record and incorporated it in identical orders, dated June 13, 2025, which changed Children's permanency goals to adoption. On July 11, 2025, Mother filed timely notices of appeal and concise statements pursuant to Pa.R.A.P. 1925(a)(2)(i). The dependency court adopted its identical orders from June 13, 2025 as its opinion on appeal. *See* Opinion Pursuant to Rule 1925(a), 7/18/25, at 1. On September 5, 2025, this Court consolidated the appeals *sua sponte*.

> Mother presents the following issue for review:
>
> Whether the [dependency c]ourt erred in changing the goal[s] to adoption when Mother had resolved her criminal matter[s], successfully completed inpatient [drug treatment,] and was residing at and participating in Sojourner House's program?

- 6 -

Mother's Brief at 4.

*Discussion*

We review the orders changing Children's permanency goals for an abuse of discretion. *In Int. of L.T.*, 158 A.3d 1266, 1276 (Pa. Super. 2017). As an appellate court, we must accept the dependency court's findings of fact and credibility determinations if they are supported by the record. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). To find an abuse of discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias, or ill will. *Int. of K.C.*, 310 A.3d 296, 303 (Pa. Super. 2023).

Notably, when considering a request to modify a child's permanency goal, the court must focus on the health and safety of the child, "which takes precedence over all other considerations." *See In re A.H.*, 763 A.2d 873, 878 (Pa. Super. 2000). The Juvenile Act directs the court to consider:

> (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child[ ]; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citing 42 Pa.C.S. § 6351(f)).

This Court has explained:

[I]ssues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301–65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*In re A.B.*, 19 A.3d 1084, 1088 (Pa. Super. 2011) (citations omitted).

Here, Mother argues that the court erred by changing Children's permanency goal to adoption because she "had remedied the situation which brought [C]hildren into care." Mother's Brief at 8. Mother emphasizes evidence that she resolved her outstanding criminal matters, successfully completed drug treatment, and resided at Sojourner House. *Id.* at 15. She asserts that Sojourner House, "as to housing, education, counseling, services, childcare and supervision[,] ensured the continued success of the Mother and safety of the children." *Id.* at 13.

To the contrary, CYF argues that the court did not err, as the record contains "ample evidence to support the [c]ourt's finding that it was in [C]hildren's best interest to change the primary permanency goal[s] to adoption." CYF's Brief at 16. CYF states:

What [M]other overlooks, however, is that H.M. (age 3) and K.M. (age 1), had been in placement 15 months, had been in the same pre-adoptive foster home the entire time, had established a bond with [F]oster [P]arents, [and] had their older sister residing in the same home[, where she] was also being adopted by the foster family. Moreover, there was a long history of instability in

- 8 -

[M]other's home, poor home conditions, neglect, chronic drug addiction, incarcerations and domestic violence. [M]other never made any progress while in the community[,] and only made progress while incarcerated or in inpatient treatment. The record support[s the finding] that it would take an extended period of time for [M]other to establish that she could safety care for [C]hildren.

*Id.*

Upon review, we agree that the court did not err or abuse its discretion. The court noted that Children had lived with Foster Parents "since their initial placement" in February 2024. Order, 6/13/25, at 7. The court stated:

[H.M.] continues to do well in [Foster Parents'] home. She has developed a bond with both [F]oster [P]arents and refers to them as "mom" and "dad." [H.M.] is especially close with [F]oster [F]ather[,] who she constantly seeks out to hold and play with her. …

[K.M.] continues to do well in [Foster Parents'] home. He has developed a connection with both [F]oster [P]arents and has started using the words "mama" and "dada" when talking to them. At times, [he] does struggle with separation anxiety with [F]oster [M]other and will become upset when she leaves the room.

*Id.* at 8. The court further explained:

[Mother] has made progress at Sojourner House but is still under restrictions and is in Phase 2 of a 4-Phase program. Th[is c]ourt, however, does not find placement of [H.M.] and [K.M.] with [Mother] in their best interest for multiple reasons. First, the record is clear that [C]hildren, prior to their placement, were not safe in [Mother's] care and were subject to chronic poor home conditions, poor hygiene, lack of supervision, criminal activity and the drug culture. This appears to have been going on for [C]hildren's entire lives. … While Mother believes that she will achieve Phase 4 in perhaps the next 60 days, there is no guarantee[,] and in the interim[,] we do not find that placement of [Children] in such a situation is in their best interests. [Mother] would require a significant period of time in the community to demonstrate stable housing, sobriety[,] and demonstrate that

- 9 -

[she] could safely parent [C]hildren. Conversely, [Children] are safe, stable and bonded with [Foster Parents,] who are an adoptive resource. … It makes no sense to separate [Children] from [their older sister, N.M.,] and their pre-adoptive home[,] to place them with [M]other in an experiment to see if she will follow through with the program and maintain her sobriety.

*Id.* at 10-11. Thus, the court decided that it was in Children's best interests to change their permanency goals to adoption. **See id.** As the record supports the decision, we discern no abuse of discretion, and affirm the orders changing Children's permanency goals.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 1/21/2026