J-S03045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.J., NATURAL FATHER | : | No. 1482 WDA 2016 |

Appeal from the Order Entered September 7, 2016
in the Court of Common Pleas of Erie County
Domestic Relations at No(s): No. 218 of 2015

BEFORE: OLSON, SOLANO, and STRASSBURGER[*], JJ

MEMORANDUM BY STRASSBURGER, J.: **FILED FEBRUARY 10, 2017**

C.J. (Father) appeals from the order entered September 7, 2016, in the Court of Common Pleas of Erie County, which changed the permanency goal for his minor daughter, A.L.J. (Child), born in July 2015, to adoption.[1] After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this matter as follows.

> On September 23, 2015, the Erie County Office of Children and Youth ([OCY]) filed an Emergency Protective Order ([EPO]) Application in regards to … [Child]. Father and D.P. ([Mother]) were listed as [Child's] parents. In its EPO Application, OCY stated that it had received a referral on September 15, 2015[,] from Warren County Children and Youth Services (Warren

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother's parental rights to Child were terminated by consent on September 19, 2016.

County CYS]). Father and Mother had an open case in Warren County since August 11, 2015[,] and were receiving services. Father and Mother moved with [Child] to Erie County on September 10, 2015. Warren County indicated Father as a perpetrator of physical abuse regarding [Child.] According to the EPO Application, in the summer of 2015 Father "had slammed [C]hild into his chest and caused visible injury to [C]hild." As a consequence of Father's actions, Father was charged with simple assault and harassment in connection to this incident. As of the time of filing the EPO Application, Father was only allowed supervised contact with [Child]. OCY alleged that both Mother and Father are "limited," as Father has been diagnosed with mental retardation ([MR]) and Mother has been diagnosed with Depressive Bipolar Disorder. The EPO also set forth OCY's concern that [] Mother could not adequately supervise Father's time with [C]hild because of her limited mental capacity and the fact that she would leave [Child] alone with Father who was mandated to only have supervised custody of [C]hild.

The Honorable Daniel J. Brabender, Jr. issued an EPO on September 23, 2015[,] for [Child], finding that removal of [Child] was necessary for the welfare and best interest of [Child] and that, due to the emergency nature of the removal and safety considerations of [C]hild, any lack of services to prevent removal were reasonable. Consequently, [Child] was placed in the temporary protective physical and legal custody of OCY. Thereafter, [Child] was placed in the [B.] foster home. [C]hild was, at this time, two months old. Also, [C]hild has consistently presented with special needs to include Gastroesophageal Reflux Disease ([GERD]), far sightedness requiring her to wear glasses, and developmental delays requiring both "physical and occupational" therapy.

Subsequently, a [s]helter [c]are [h]earing pursuant to 42 Pa.C.S. § 6332 was held before the Juvenile Master, Carrie Munsee, Esquire, on September 24, 2015. Mother stipulated to continued shelter care pending an adjudication hearing. The Master conducted a colloquy with Father and was not convinced that Father was able to represent himself, even though he wished to do so, because of Father's cognitive limitations, including [his] MR diagnosis. Out of an abundance of caution, the Master secured counsel for Father and he returned the following day, September 25, 2015, with counsel. At this hearing, Father stipulated to continued shelter care pending an

[a]djudication [h]earing. [Child's] guardian *ad litem*, Patricia Ambrose, Esquire, was also in agreement. Master Munsee recommended that [Child] remain in the [B.] foster home, which was subsequently signed as an [o]rder by the Honorable Robert Sambroak on October 1, 2015.

A [d]ependency [p]etition for [Child] was filed by OCY on September 25, 2015. The [d]ependency [p]etition incorporated the allegations set forth in the EPO Application. The [p]etition continued and recognized that Father had a history with Warren County CYS involving [Child] based on Father's "cognitive limitations, physical abuse, lack of supervision, lack of parenting skills, and being uncooperative with service providers." OCY further noted that Father continued to reside in the home with Mother and [Child and] was often left alone and unsupervised with [Child], "despite being court ordered to have no contact [with Child] as a condition of his bond." OCY was additionally concerned that Father was unable to safely parent [Child] due to his "significant cognitive limitations."

An [a]djudicatory [h]earing was held on October 1, 2015[,] before Master Munsee. Master Munsee found that [C]hild was dependent without proper care or control and recommended the continued placement of [Child] in the [B.] foster home. This recommendation was subsequently signed as an Order by this Court on October 5, 2015.

A [d]ispositional [h]earing was held before this Court on October 28, 2015. At the [d]ispositional [h]earing, [C]hild was represented by her guardian *ad litem*, Emily M. Merski, Esquire. Mother was not present, however her attorney, Justin D. Panighetti, Esquire, was present. Father was present and represented by Anthony R. Himes, Esquire. OCY caseworker Patty Bush was present, as well as OCY solicitor Anthony G. Vendetti, Esquire. The [c]ourt incorporated the Court Summary into the Record and received testimony from the OCY caseworker. At the conclusion of the hearing, the [c]ourt found that [Child] was dependent as she was without proper parental care or control. The permanency goal was established as "Return to Parent or Guardian."

\* \* \*

- 3 -

[C]hild continued to be placed in the [B.] foster home where she was being well cared for and her special needs were being met. Visitation with the parents was to continue and be increased in accordance with the parties' progress and compliance. A six month Permanency Review Hearing was ordered.

In February 2016, Father pleaded guilty to the simple assault of [Child from the summer of 2015.] Father was sentenced on February 19, 2016[,] to a term of incarceration of one to two years, with the earliest possible release date being February 17, 2017. Additionally and importantly, as a condition of his supervision, Father was Court ordered not to have any contact with the victim of the assault, [Child]. However, Judge Hammond did denote that any contact Father would have with [C]hild would be further determined by the Dependency Court. Accordingly, Father's last visit with [C]hild was February 12, 2016.

Trial Court Opinion, 10/31/2016, at 1-5 (footnotes and citations to the record omitted).

The trial court conducted a permanency review hearing on June 27, 2016. On July 5, 2016, the court entered a permanency review order changing Child's permanency goal from reunification to reunification concurrent with adoption. The court conducted an additional permanency review hearing on August 31, 2016. On September 7, 2016, the court entered a permanency review order changing Child's goal from reunification concurrent with adoption to adoption only. Father timely filed a notice of appeal on September 30, 2016, along with a concise statement of errors complained of on appeal.

Father now raises the following claims for our review.

1. Whether the [trial] court committed an abuse of discretion and/or error of law when it determined that [OCY] had presented

sufficient evidence as a basis to change the goal to adoption in regards to [Father]?

2. Whether the [trial] court committed an abuse of discretion and/or error of law when it determined that [Father] had not been compliant with the permanency plan and/or court order?

Father's brief at 6 (trial court answers and suggested answers omitted) (unnecessary capitalization omitted).

We consider Father's claims mindful of the following.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Instantly, Father's claims on appeal are interrelated, so we address them together. Father's first claim is that OCY failed to present sufficient evidence to support changing Child's permanency goal to adoption. Father's brief at 15-19. Specifically, Father argues that it was improper for the trial court to change Child's goal to adoption following the August 31, 2016 permanency review hearing, given that the court declined to change Child's goal to adoption following the prior permanency review hearing on June 27, 2016. *Id.* Father argues, "There was insufficient testimony and evidence presented at the final permanency review hearing as it related to any changed circumstances and/or adoption at that time but not at the prior permanency review hearings where the same goal was recommended and requested by [OCY]." *Id.* at 15. In his second claim, Father argues that the court abused its discretion by concluding that he failed to comply with Child's permanency plan and/or court orders. *Id.* at 15, 19-23. Father argues that he completed or began most of his court-ordered services prior to his incarceration, and that he "remained willing and anticipatory to participate in further services both while incarcerated and following his release." *Id.* at 15.

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court explained that it changed Child's permanency goal to adoption "based on Father's inability to safely parent [Child], … his admitted assault on [Child], his issues of anger and hostility, and [because psychologist, Peter von Korff, Ph.D., who performed a psychological evaluation of Father,] opined that Father

would not benefit from further counseling or parenting classes." Trial Court Opinion, 10/31/2016, at 12. The court also emphasized that Child has resided in same pre-adoptive foster home since she was two months old, and that this foster home can provide Child with safety, stability, and love. *Id.* at 14-15.

After a thorough review of the record in this matter, we conclude that the record supports the trial court's decision to change Child's permanency goal to adoption, although our reasoning differs somewhat from that of the trial court. Initially, we note that the court appears to have misinterpreted the conclusions contained in Dr. von Korff's psychological evaluation. In its opinion, the court indicated that it "glean[ed] from Dr. von Korff's report that … Dr. von Korff does not see any benefit for services for Father." *Id.* at 7. Our review of Dr. von Korff's psychological evaluation does not support this interpretation. The relevant portion of the psychological evaluation provides as follows.

> [Father] has been referred for the treatments appropriate to his circumstance. The writer sees no benefit to any additional services at this time. The client's progress will be measured by his ability to make use of his current treatment program of supervised visitations, anger management, and parent-child training. The current assessment did not find evidence of a super ceding [*sic*] psychological or psychiatric disorder. Rather, the data suggested a chronically inhibited, mildly depressive and socially awkward individual who has a great deal of work to do in establishing a healthy and productive adult life pattern.

Dr. von Korff's psychological evaluation, at 10.

Thus, it does not appear that Dr. von Korff concluded that providing Father with services would be futile as the trial court suggests. Instead, Dr. von Korff concluded that the services Father was receiving were "appropriate to his circumstance," and that Father would not benefit from receiving services in addition to the services that he was already receiving. *Id.* This interpretation is further supported by Dr. von Korff's statement that Father's "progress will be measured by his ability to make use of his current treatment program." *Id.*

Nonetheless, we conclude that the other evidence relied upon by the trial court more than sufficiently supports its decision to change Child's permanency goal to adoption. Most notably, the court emphasized Father's struggle to parent Child appropriately during visits prior to his incarceration, as well as Father's dismal performance caring for a baby simulator doll. Trial Court Opinion, 10/31/2016, at 13-14.

Father's parenting deficits during visits were detailed in a report prepared by Erie Homes for Children and Adults, Inc. (EHCA).[2] In its report, dated February 18, 2016, EHCA explained that Father was "very careless when handling [Child] and … limited in his overall interactions with her."

_____

[2] Neither the EHCA report, nor Dr. von Korff's psychological evaluation, was presented to the trial court during the August 31, 2016 permanency review hearing. However, the court indicated that these reports would be incorporated by reference. N.T., 8/31/2016, at 6. The reports are contained in the certified record as attachments to a court summary.

EHCA Report, at 1 (unnumbered pages). EHCA staff attempted to improve Father's interactions with Child by providing one-on-one instruction and demonstrations. *Id.* at 2. While Father would listen to this instruction, and would participate occasionally, "when left to do some of the tasks independently, he often wouldn't at all or would revert back to unsafe practices." *Id.*

The report provided the following example.

> On one occasion in particular, staff had just exited the visitation room after having a lengthy talk with [Father] about safe ways to hold [Child] and what not to do that could cause harm including excessive rocking or movement that would not support her head and neck. As soon as staff left the room, [Father] was seen tossing [Child] in the air in an unsafe manner. Staff immediately reentered the room and observed [Father] holding [Child] in a very awkward position while having a stunned look on his face. When staff inquired about why he was presenting this way, he asked[ "]Did you see that?" and then "Do you see everything[?"] Staff again asked why he was presenting this way and he stated "Because I knew it was wrong[."] Staff then asked why he tossed her in the air then if he knew it was wrong and he stated "Because I wanted to[.]" This type of defiant and unsafe behavior is frequently observed.

*Id.*

In addition, the report explained that Father participated in two simulations using a baby simulator doll on February 5, 2016, and February 12, 2016. *Id.* Father did "very poorly" during both simulations. *Id.* During the first simulation, Father failed to complete any parenting tasks with the doll, including feeding, rocking, changing, or burping, and scored a -60%. *Id.* Most troublingly, Father admitted to EHCA staff that he understood that

he was to treat the doll exactly as he would treat Child. *Id.* Despite this understanding, Father informed EHCA staff that he at one point left the doll home alone because he "'didn't feel like carrying it around town,'" and also left the doll in a closet because it was crying too much. *Id.* Father even acknowledged that he "struck the doll in the face because it would not stop crying." *Id.* While Father performed better during his second simulation with the doll, he still failed to perform numerous parenting tasks, and scored only a 32%. *Id.* at 3. Ultimately, EHCA found that Father "demonstrated very questionable, dangerous[,] and overall unsafe practices with [Child] and the real care simulator, so it would not be recommended that any visitation be increased until he shows improvement." *Id.* at 4.

Thus, it is clear that Child's best interest would be served by changing her permanency goal to adoption. While the record reveals that Father was minimally compliant by participating in services prior to his incarceration, Father's severe parenting deficits remained unresolved at the time he began his current period of incarceration. This was demonstrated most compellingly by Father's performance with the baby simulator doll. Although Father knew that he was to treat the doll exactly as he would treat Child, he failed to care for the doll appropriately and even went so far as to strike the doll in frustration. Even after Father is released from incarceration no sooner than February 2017, it is not clear when, if ever, Father will be capable of parenting Child safely. Finally, as observed by the trial court,

- 10 -

Child has spent nearly her entire life residing in the same pre-adoptive foster home.

We also reject Father's claim that it was improper for the trial court to change Child's goal to adoption following the August 31, 2016 permanency review hearing, given that the court declined to change Child's goal to adoption following the prior permanency review hearing on June 27, 2016. Father does not direct our attention to any authority indicating that a trial court is prohibited from changing a child's permanency goal if the court previously declined to change that goal under the same circumstances. To the contrary, in the context of a dependency proceeding, the fact that circumstances have not changed can be an important and compelling reason to change a child's goal. In this case, by declining to change Child's goal to adoption following the hearing on June 27, 2016, the court provided Father with an additional two months to demonstrate that he someday will be able to resolve his parental incapacity and care for Child. The fact that the circumstances did not change, and that, therefore, Father's likelihood of being able to care for Child did not improve, actually supports the court's decision.[3]

_____

[3] Father also challenges the trial court's finding of no compliance with the permanency plan in the September 6, 2016 order. Specifically, Father argues that this finding was in error because he had done and was doing everything possible to comply with the plan despite his incarceration. **See** Father's Brief at 19-23. Despite the fact that Father included this issue in his concise statement, the trial court did not address it in its opinion. *(Footnote Continued Next Page)*

Based on the foregoing, we conclude that the trial court did not abuse its discretion by changing Child's permanency goal to adoption, and we affirm the court's September 7, 2016 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/10/2017

---

*(Footnote Continued)* ————————

Nevertheless, we conclude that even if Father had been substantially compliant with his plan, the trial court could still have found that it was appropriate to change the goal to adoption under these circumstances where it was not likely that Father's ability to parent would improve. ***See In re N.C.***, 909 A.2d 818, 826 (Pa. Super. 2006) (holding that a goal change may be proper where "there is ample evidence to support the trial court's factual finding that Mother's parenting ability remained problematic, even though she had substantially completed her permanency plan").