J-S35029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: B.B., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 187 WDA 2017 |

Appeal from the Order Entered January 18, 2017
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): CP-07-DP-0000067-2016

BEFORE:   LAZARUS, RANSOM, JJ., and STEVENS, P.J.E.*

MEMORANDUM BY RANSOM, J.:                    **FILED JULY 19, 2017**

B.B. ("Mother") appeals from the order dated and entered on January 18, 2017, that changed the permanency goal for her dependent male child, A.F., born in January of 2016, ("Child") from return home to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.1  We affirm.

The trial court set forth the factual background and procedural history of this appeal as follows.

> The subject child is **A.F.**, a son born [in January of] 2016 to his mother, **B.B.** and [f]ather, **P.F.**  On May 4, 2016, Blair County Children, Youth & Families (hereinafter "BCCYF") filed an Application for Emergency Protective Custody and were granted emergency temporary custody of the child.  On May 6, 2016,

---

* Former Justice specially assigned to the Superior Court.

1 Child's father, P.F. ("Father"), has not filed an appeal from the change of goal to adoption.

BCCYF filed its Dependency Petition alleging that the subject child, **A.F.**, was a dependent child who was without proper care or control, pursuant to 42 Pa. C.S.A. §6302(1) of the Juvenile Act.

Dependency Hearings were held on May 11, July 26 and August 11, 2016 after which the **Order of Adjudication and Disposition - Child Dependent** was entered August 18, 2016, finding the child to be dependent and granting legal and physical custody to BCCYF. The original goal was return home to parent (Father) with a concurrent goal of adoption. Both parents were directed to undergo a global psychological evaluation and follow through with all recommendations. In addition, the Mother was directed to continue with her mental health counseling and medication management and follow all treatment recommendations. In light of a prior Involuntary Termination of Parental Rights Decree entered against the Father relative to his older child, E.M., we granted BCCYF's Motion for Finding of Aggravated Circumstances against the Father under [the] Order entered August 18, 2016.

After the 6th Month Permanency/Dispositional Review Hearing held August 18, 2016, a **Permanency Review Order** was entered **October 21, 2016**, wherein the subject child, A.F., remained a dependent child, legal and physical custody remained vested in BCCYF, and the goal remained return home to parent, with a concurrent goal of adoption. The parents were directed to comply with all recommended services, including the global assessment that was scheduled with Dr. Terry O'Hara.

A 9th Month Interim Permanency/Dispositional Review/Goal Change Hearing was held on January 10, 2017, after which a **Permanency Review Order** was entered **January 18, 2017** finding, inter alia, that the subject child remained dependent; that legal and physical custody remained vested with BCCYF; and that the primary goal was changed to adoption, with a concurrent goal of adoption.

The [m]other, **B.B.**, timely filed a Notice of Appeal on January 23, 2017, and in her Concise Statement of Errors Complained of on Appeal, stated that "[t]he trial court erred and/or abused its discretion when it changed the permanency

goal of the subject child from Return Home to Adoption."  The [f]ather, P.F., did not file a Notice of Appeal.

Trial Court Opinion, 2/22/17, at 1-3 (emphasis in original).

On April 10, 2017, Mother's trial counsel, Attorney Traci L. Naugle, who initially served as her appellate counsel and filed her notice of appeal, concise statement, and brief, filed a motion to withdraw as Mother's counsel. On April 20, 2017, Attorney Richard M. Corcoran entered his appearance in this Court on behalf of Mother.  On April 25, 2017, this Court entered an order granting the motion for leave to withdraw.

In her brief on appeal, Mother raises the following issue:

I. Whether the trial court erred and/or abused its discretion when it changed the permanency goal of the subject child from return home to adoption?

Mother's Brief, at 4.

Mother concedes that the record is clear that she suffers from an intellectual disability and mental health issues.  *Id.* at 8.  Mother states that her intellectual disability and mental health issues caused concern for Terry O'Hara, Ph.D., the psychologist who performed a global assessment of her, regarding whether she has the ability to appropriately parent her child.  *Id.* at 8-9.  Mother urges that Dr. O'Hara testified that she had positive interactions with Child during her interactional interview, and she has a desire to parent.  *Id.* at 8.  Mother, therefore, requests that this Court

reverse the trial court order, and direct that the permanency goal for Child be restored to return to home. *Id.* at 8.[2]

Mother's challenge to the change of Child's permanency goal to adoption is controlled by the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.* The Pennsylvania Supreme Court set forth our standard of review in a dependency case as follows.

> "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.*, 608 Pa. 9, [27], 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

*In Interest of: L.Z.*, *A Minor Child*, 631 Pa. 343, 360, 111 A.3d 1164, 1174 (2015).

---

[2] In the argument section of her brief, Attorney Naugle states that Mother's limitations presented an issue for counsel in advising Mother about the dependency case, the appeal, and the likelihood of success of her case. Mother's Brief, at 9. Attorney Naugle, on behalf of Mother, requests this Court to appoint a guardian *ad litem* for Mother in future proceedings in this matter. *Id.* at 8. Mother has failed to raise this request in a petition, and she does not develop it with any citation to case law, statute, or rule of court. We find that her request is not properly before this Court, which is a reviewing court, and that Mother's counsel would more appropriately file a petition for the appointment of a guardian *ad litem* for Mother in the trial court with regard to any future proceedings. *See* Pa.R.J.C.P. 1151. Assignment of Guardian Ad Litem & Counsel, Comment (stating, "Nothing in these rules anticipates that a guardian *ad litem* for an adult is to be appointed by these rules. For appointment of a guardian of the person, see 20 Pa.C.S. § 5501 et seq. and Pa.O.C. Rules 14.2-14.5).

With regard to our review of a goal changes in a dependency case, this

Court recently set forth the following:

> In cases involving a court's order changing the [court-ordered] goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate principles to that record. Therefore, our scope of review is broad.

> *In re S.B.*, 2008 PA Super 21, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted); *see also In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010).

> In *In re A.K.*, 2007 PA Super 321, 936 A.2d 528, 534 (Pa. Super. 2007), this Court stressed that the focus of dependency proceedings is upon the best interest of the children and that those considerations supersede all other concerns, "including the conduct and the rights of the parent." Again, in *In the Interest of D.P.*, 2009 PA Super 86, 972 A.2d 1221, 1227 (Pa. Super. 2009), we explained, "In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." *Id.* Likewise, this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 2006 PA Super 285, 909 A.2d 818, 824 (Pa. Super. 2006) (quoting *In re Adoption of M.E.P.*, 2003 PA Super 210, 825 A.2d 1226, 1276 (Pa. Super. 2003)).

> With those principles in mind, we outline the relevant considerations set forth in the Juvenile Act regarding permanency planning:

> Pursuant to § 6351(f), of the Juvenile Act, when considering a petition for a goal change for a dependent

- 5 -

child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

*In re A.B.*, 2011 PA Super. 75, 19 A.3d 1084, 1088-89 (Pa. Super. 2011). Additionally, courts must consider whether reasonable efforts were made to finalize the permanency plan in effect. *See* 42 Pa.C.S. § 6351(f)(5.1).

*In the Interest of L.T.*, 158 A.3d 1266, 1276-1277 (Pa. Super. 2017).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

With regard to the goal change, the trial court stated as follows:

As set forth above, there were three (3) separate hearings held May 11, July 26, and August 11, 2016 prior to entry of our **Order of Adjudication and Disposition - Child Dependent** on **August 18, 2016**. In summary fashion, we found the subject child to be dependent based upon several factors, including but not limited to the [m]other's significant mental health issues and cognitive deficiencies which affect her bonding and attachment and her ability to safely care for, the child; the [f]ather's own mental health issues; the parents, and especially the [f]ather's, lack of cooperation with the recommended services, including but not limited to Early Intervention and

- 6 -

Parents as Teachers program; unknown people consistently coming in and out of their home; the developmental concerns relative to the child; the lack of establishing a consistent and appropriate feeding schedule and daily routine for the child; the [f]ather's lack of employment; the domestic disputes within the home between the parents and the paternal grandfather, who has his own mental health issues and is not appropriate around the child; and the general lack of progress made by the parents despite the intensive efforts by service providers. BCCYF and the service providers classified this case as a "high risk" case, and various providers confirmed that they could not ensure the safety of the child despite their involvement.

For purposes of the reasons why we changed the goal to adoption in our Permanency Review Order of January 18, 2017, we will rely upon our findings made after the 6th Month Review and 9th Month Review hearings, and would highlight the following findings from each.

From our **October 21, 2016 Permanency Review Order** entered after the 6th Month Permanency/Dispositional Review Hearing, we made the following findings pertaining to the Mother, B.B.:

[T]he mother is involved in out-patient mental health counseling through Primary Health Network and receives medication management from Dr. Ali. She is starting with North Star Support Services to assist her accessing resources for independent living. The mother was hospitalized at Clarion Psychiatric Center from 9/23 to 9/30/16 due to threats of self–injurious behavior. Her medication was changed, and it seems to have benefitted the mother as she seems happier, more upbeat and talkative. The mother was discharged from the FICS [Family Intervention Crisis Services] Nurturing Program due to a lack of attendance. Reunification services recently commenced for the parents through New Steps/Kids First and initially, there will be one 2-hour visit with the child each week at the agency or the public library. There remains a concern of inappropriate people residing in the family home which will impede reunification efforts if such situation is not rectified. The mother receives SSI [Supplemental Security Income] benefits and the father serves as the Representative Payee. Both

- 7 -

parents are scheduled for a global assessment with an interactional evaluation with Dr. Terry O'Hara on 10/26/16.

From our **January 18, 2017** Permanency/Dispositional Review Order entered after our 9th Month Interim Permanency/Dispositional Review Hearing, we made the following findings pertaining to the Mother, B.B.:

[B]ecause of the lack of progress and cooperation by the parents, safety and the concerns that continue to exist, all visits between the parents and child through FICS Reunification Services have remained fully supervised and occur at a public location (Altoona Area Public Library). Shannon Cameron of FICS testified that since FICS opened services on 10/3/16, the parents have attended only 6 of the 14 scheduled meetings, where visitation coaching takes place. The mother has attended 9 of the 13 scheduled visits, and the father 7 of 13 visits. Ms. Cameron indicated that the inconsistent attendance has absolutely hindered the services being provided and limited the parents' progress. The last visit the parents attended was on 12/27/16. They missed their 12/28/16 meeting and a rescheduled meeting and there have been no visits or meetings since. Ms. Cameron noted that there are several concerns relative to reunification efforts in addition to lack of attendance, such as the parents' lack of accountability as to why they need services and why their child is in placement; the mother's mental health issues which affect her ability to make appropriate decisions as to basic necessities - when to feed the child, how much to feed, etc. The parents express love for the child and are happy and excited to see [Child], but there is a lack of consistency with their overall commitment to reunification. There are on-going financial issues for the parents. The mother receives SSI benefits, for which the father is her representative payee (which has created issues in and of itself) while the father has not maintained consistent employment. The paternal grandfather, [D.F. or "Paternal Grandfather"], who has significant mental health issues and is not an appropriate individual to be around the young child, remains in the home and, thus, creates an obstacle to reunification efforts. Ms. Cameron testified that although [Father] acknowledges his father's significant

mental health issues, he does not appear to understand the significance this plays on [Child] being able to safely return home. Further, Ms. Cameron expressed a constant concern as to the parents' ability to attend to the daily needs of the child. FICS cannot ensure the child's safety within the parents' home. In addition to the above, there are significant domestic disputes within the home. Ms. Cameron said there has been no progress made relative to reunification efforts and that she and her agency fully support the goal change to adoption.

Dr. Terry O'Hara, a licensed psychologist who specializes in Forensic Psychology, conducted psychological evaluations on both parents as well as an interactional observation of the parents with their child. He authored a report [Petitioner's Exhibit 1] which we incorporate herein by reference. In summary, Dr. O'Hara expressed concern relative to the mother's intellectual capacity and ability to safely care for the child. He found that she is limited in her ability to learn and internalize skills; that she is vulnerable and easily manipulated; that she failed to follow through and seek mental health services through North Star Services; and that she does not fully and concretely understand the child's developmental needs and how to address those needs. Dr. O'Hara commented on the mother's long-standing mental health issues and opined that the child would be at significant risk if returned to the parents' care or if left unsupervised with the mother. Even though the mother demonstrated some positive parenting skills, Dr. O'Hara noted that the mother was unable to provide information regarding the child's developmental needs; she denied any parenting weaknesses; there was a lack of verbal engagement, which is critical at the child's young age; and she failed to demonstrate any insight or accept any responsibility for why the child is in placement. Dr. O'Hara testified he that has an on-going concern regarding the parents' long-term ability to provide for the child. The concerns will not be remedied within a reasonable period of time, and Dr. O'Hara concluded that what is most important for this young child is permanency. Tracey Dom, the Blended Case Manager from Home Nursing Agency, testified that she has worked with the mother for approximately 1½ years. She confirmed that

the mother receives medication management through Primary Health Network. Ms. Dom tries to meet weekly with the mother, but acknowledges that the mother struggles with scheduling. Ms. Dom's last visit to the parents' home was on 11/22/16 and she admitted that her interaction with [Paternal Grandfather] was "a little alarming at times".

Ronna Holliday, the caseworker from BCCYF assigned to this family since late-April/early-May, 2016, testified that the child is with a foster family where he is well taken care of and his needs are met. Unfortunately, the foster parents are not an adoptive resource, but the Agency has identified two potential adoptive resources. [Child's] development is age-appropriate and physical therapy was discontinued in November, 2016. He is not involved in any services at this time.

Based upon the foregoing, we submit that the goal change to adoption was appropriate and in the subject child's best interest and welfare. Therefore, we respectfully request your Honorable Superior Court to affirm our Permanency Review Order of January 18, 2017 wherein the goal was changed to adoption.

Trial Court Opinion, 2/22/17, at 5-9 (emphasis in original).

After our careful review of the record in this matter, we find no abuse of discretion on the part of the trial court in changing Child's permanency goal to adoption. *See* *L.T.*, 158 A.3d 1266, 1276-1277; *L.Z.*, 631 Pa. at 360, 111 A.3d at 1174. Accordingly, we affirm the trial court's order changing Child's permanency goal to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/19/2017