J. S44042/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.M., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.D., NATURAL MOTHER | : | No. 627 WDA 2019 |

Appeal from the Order Entered March 22, 2019,
in the Court of Common Pleas of Clarion County
Civil Division at No. CP-16-DP-0000008-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: B.M., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.D., NATURAL MOTHER | : | No. 629 WDA 2019 |

Appeal from the Order Entered March 22, 2019,
in the Court of Common Pleas of Clarion County
Civil Division at No. CP-16-DP-0000009-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.M., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.D., NATURAL MOTHER | : | No. 631 WDA 2019 |

Appeal from the Order Entered March 22, 2019,
in the Court of Common Pleas of Clarion County
Civil Division at No. CP-16-DP-0000010-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: A.V., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.D., NATURAL MOTHER | : | No. 632 WDA 2019 |

J. S44042/19

Appeal from the Order Entered March 22, 2019,
in the Court of Common Pleas of Clarion County
Civil Division at No. CP-16-DP-0000031-2018

IN THE INTEREST OF: X.D., MINOR : IN THE SUPERIOR COURT OF
 : PENNSYLVANIA
 :
APPEAL OF: S.D., NATURAL MOTHER : No. 635 WDA 2019

Appeal from the Order Entered March 22, 2019,
in the Court of Common Pleas of Clarion County
Civil Division at No. CP-16-DP-0000032-2018

BEFORE: SHOGAN, J., McLAUGHLIN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:  **FILED SEPTEMBER 23, 2019**

S.D. ("Mother") appeals from the March 22, 2019 permanency review orders entered in the Court of Common Pleas of Clarion County, Juvenile Division, that changed the placement goals of Mother's children, R.M., female child, born in September 2011; B.M., male child, born in October 2012; Z.M., female child, born in December 2016; A.V., female child, born in July 2014; and X.D., male child, born in October 2015 (collectively, the "Children") from reunification to adoption.[1]  We affirm.

At the outset, we note that the record reflects that C.M. is the natural father of R.M., B.M., Z.M., and X.D, and J.V. is the natural father of A.V.  For

---

[1] Pursuant to Pa.R.A.P. 513, this court consolidated Mother's appeals *sua sponte*. (*Per curiam* order, 5/9/19).

- 2 -

ease of discussion, we will refer to C.M. as "Father C.M." and J.V. as "Father J.V." We further note that the record reflects that Father C.M. appealed from the March 22, 2019 permanency review orders that changed the goals of his natural children to adoption, and his appeals were consolidated with Mother's appeals. On June 17, 2019, however, Father C.M. filed a praecipe for discontinuance of appeals because he "decided to voluntarily relinquish his parental rights and no longer wishes to appeal the goal change." (Father C.M.'s praecipe for discontinuance, 6/17/19.) On the same day, this court discontinued Father C.M.'s appeals. (Notice of discontinuation of action, 6/17/19.) Father J.V. appealed from the March 22, 2019 permanency review order that changed the goal of his natural child, A.V., to adoption. His appeal was not consolidated with Mother's and Father C.M.'s appeals, but it was listed consecutively for disposition by this panel at appeal No. 633 WDA 2019. (**Per curiam** order, 5/9/19.)

By way of background, we note that the record reflects that at the time of the permanency review hearing, Mother and Father C.M. were married. The record is unclear, however, as to when they married, but the record indicates that it occurred after A.V.'s birth. (Notes of testimony, 3/22/19 at 109.) The record also indicates that prior to A.V.'s dependency, she lived with Mother and Father C.M. The record is clear that A.V. never lived with Father J.V. and that between A.V.'s birth and her dependency, Father J.V. had "a few months" of shared partial custody of A.V. due to Father J.V.'s numerous incarcerations.

(*Id.* at 116-117.) A reading of the permanency review hearing transcript reveals that Mother and Father C.M. consider Father C.M. to be A.V.'s father. Indeed, Father C.M. testified that A.V. calls him "dad." (*Id.* at 90.) This is important to note because in these appeals, the trial court filed five separate Rule 1925(a)(2)(ii) opinions with respect to each of the Children. In all of the opinions, the trial court appears to refer to Mother and Father C.M. as the "parents" of all five Children. After thoroughly reviewing the record, we interpret the majority of the trial court's references to "parents" in its opinions to mean Mother and Father C.M. Where clarification is necessary, we have added explanatory footnotes.

With that backdrop in mind, we set forth the following history of these cases from the trial court's opinions which, apart from the first paragraphs, are virtually identical:

> The record shows that Clarion County Children and Youth Services [("CYS")] has been involved with the parents since 2013. [Mother and Father C.M. placed B.M., R.M., and Z.M.] voluntarily with [M]other's sister [and then placed X.D. and A.V. voluntarily with Mother's friend[2]] due to [Mother's] incarceration, lack of proper housing and financial means, and general inability to care for [the Children]. [Mother's sister was then incarcerated] and on April 26, 2018 CYS placed [R.M., B.M., and Z.M.] in shelter care with foster parents and petitioned for dependency. Following a shelter care hearing, [the trial court] continued the foster care placement and then following an adjudication hearing, found [R.M., B.M.,

---

[2] The record reflects that at the time A.V. was placed with Mother's friend, Father J.V. was incarcerated. (Notes of testimony, 3/22/19 at 16.) Nothing in the record indicates that Father J.V. objected to the placement.

and Z.M.] dependent on May 25, 2018 and again continued foster care placement. [With respect to X.D. and A.V., who were in the custody of Mother's friend until October 29, 2018, an emergency shelter care hearing was held on November 1, 2018, and X.D. and A.V. were placed in foster care. The trial court adjudicated X.D. and A.V. dependent by order entered November 16, 2018.[3] and continued foster care placement. The trial court] found at [all] hearings that the parents had failed to make sufficient progress toward meeting the goals of the family service plan and that [the Children remain] dependent and the foster care placement was appropriate.[4]

Trial court opinions, 5/21/19 at 1-2, filed at Clarion County Court of Common Pleas, Civil Division, Docket Nos. CP-16-DP-0000008-2018, CP-16-DP-0000009-2018, CP-16-DP-0000010-2018, CP-16-DP-0000031-2018, and CP-16-DP-0000032-2018.

At the most recent hearing, CYS sought a goal change; from reunification to adoption. CYS caseworker Mary Jo Milford testified that [Mother] missed mental health treatment appointments in January and February. The parents provided numerous names as possible caregivers to CYS, who were all disapproved. They did not attend educational meetings for the [C]hildren in the past. CYS proposed a goal change because the parents have failed to provide stability in their home, they have missed visits

---

[3] In its five Rule 1925(a)(2)(ii) opinions, the trial court states that all of the Children were adjudicated dependent on May 25, 2018. Our review of the record, however, reveals that the orders adjudicating X.D. and A.V. dependent are dated November 7, 2018, and were entered on the respective dockets on November 16, 2018.

[4] The finding was made as to Mother, Father C.M., and Father J.V.

with the [Children], they have been incarcerated,[5] and [M]other was involved in criminal activity. The parents attended parenting classes, but minimal skills have been applied during visits. During supervised home visits, [Mother and Father C.M.] have not been able to supervise and care for all five [C]hildren at once. They were not getting the attention that young children need. In the opinion of the caseworker, the parents do not have the ability to care for the five [C]hildren on their own.

The counselor for [R.M.] and [B.M.], Melissa Wise, who had seen them about fifteen times, testified she was concerned about lack of bonding with biological parents because they had three different caregivers up to the age of five. They referred to the foster parents as Mommy and Daddy and to their parents [by their first names]. With [B.M.], she is concerned about insecure attachment. She is concerned there is a high likelihood that [R.M.] has been sexually abused. Ms. Wise has worked with [R.M.'s and B.M.'s] foster parents. Both children are making progress in treatment, but the therapist cannot address attachment issues until there is a permanency plan. We have been dealing with both foster care and reunification and creating more psychological harm to the [C]hildren and need a permanency plan. Melissa Wise holds the opinion that in order to consider reunification, [Mother and Father C.M.] should engage in intensive trauma-based therapy for a minimum of once a week for six to twelve months.

The caseworker with Justice Works Services, Brock Morgan, testified that he transports [A.V.] and [X.D.] to visits with [Mother and Father C.M.] and [X.D.] gets upset and cries. During the visits the parents do very well with [A.V. and X.D.] one on one, but they cannot interact with multiple children at the same time. [A.V. and X.D.] go off and get into things they shouldn't. The worker stated he has been

---

[5] The record reflects that Mother and Father J.V. have been incarcerated. (**See** notes of testimony, 3/22/19 at 81, 116-117.) There is no indication in the record that Father C.M. has been incarcerated.

observing visits since the end of December and he has not seen any improvement. The visits are very hectic. In the caseworker's opinion, the children would not be safe if he was not there.

[Mother] testified that [she and Father C.M.] have been taking parenting classes and every program that is in place for four years. She believes [R.M.] was assaulted and she would be willing to participate in intensive trauma therapy. Despite parenting programs taken while in jail and the other program, which total five years, [Mother] is still struggling with five kids, with traumatized kids.

. . . .

[B.J.W.], foster father to [B.M. and Z.M.], testified that they have resided with his wife and him for about one year. [B.M.] has a lot of anxiety leading up to the visits. [Z.M.] has wet herself multiple times and has had blood in her urine. [B.M.] had a dentist appointment where he had to have metal placed in his mouth. [M.W.], foster mother, took him to the appointment. [Mother and Father C.M.] arrived one half hour late. [M.W.] was holding [B.M.'s] hand because the procedure was painful and [Mother] tried to hold his hand and he tensed up. The dentist asked everyone to leave. [Mother] had asked the dentist if [B.M.'s] condition was because of soft teeth and he said it was because of poor hygiene.

[B.W.], foster father of R.M., testified that she has resided in their home for about one year. She calls his wife and him Mom and Dad and never asks about [Mother and Father C.M.]

[R.Z.], foster father for [X.D. and A.V.], testified that they have resided with him since October 2018. [X.D.] has come home to them without his diaper being changed for a long time.

Trial court opinions, 5/21/19 at 2-5, filed at Clarion County Court of Common

Pleas, Civil Division, Docket Nos. CP-16-DP-0000008-2018, CP-16-DP-

0000009-2018, CP-16-DP-0000010-2018, CP-16-DP-0000031-2018, and CP-16-DP-0000032-2018 (citations to notes of testimony omitted).

At the conclusion of the March 22, 2019 permanency review hearing, the trial court entered the permanency review orders that changed each of the Children's goals from reunification to adoption. Mother filed timely notices of appeal, together with statements of errors complained of on appeal in accordance with Pa.R.A.P. 1925(a)(2)(i). Thereafter, the trial court filed its Rule 1925(a)(2)(ii) opinions.

As Mother's appeals have been consolidated, Mother filed one brief and raises the following issue for our review with respect to all of the Children:

> Whether the [t]rial [c]ourt erred in changing the permanency goal to adoption when Mother had made progress towards the permanency goals, and the [trial c]ourt relied heavily on Mother's lack of ability to care for all five (5) [C]hildren at one time[?]

Mother's brief at 5.

> . . . [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

The Juvenile Act governs proceedings to change a child's permanency goal. *See* 42 Pa.C.S.A. §§ 6301-6375. When considering a goal-change petition, trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*:    (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety. [. . .]
>
> The best interests of the child, and not the interests of the parent, must guide the trial court.   As this [c]ourt held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa.Super. 2011) (citations and quotation marks omitted).

Here, in her brief, Mother's first argument is that the trial court abused its discretion in changing the Children's goals to adoption because she "has made progress" towards meeting her permanency goals and because the trial court placed undue emphasis on her inability to care for all five Children at once.  (Mother's brief at 8.)  In her second argument, Mother acknowledges her struggles to parent all five Children, but expresses her willingness to engage in a trauma-based parenting program and suggests that the trial court gradually reunite her with the Children.  (*Id.* at 9.)   These arguments, however, miss the mark because "the focus of dependency proceedings is on the children's safety, permanency, and well-being—not on Mother's conduct." *In re N.C.*, 909 A.2d 818, 824 (Pa.Super. 2006) (citations omitted).  After

considering all of the evidence presented at the permanency review hearing,

the trial court concluded that:

> [W]e have a long history with all three of the parents, both in the custody and the dependency cases. These are little kids that require a lot of attention, and we know one or maybe several of them have special needs with regards to trauma that they have experienced in the past, which is a significant factor here. The parents haven't begun to deal with that issue; and based on the testimony if they would start to deal with it, it would take a long, long time. I know the witness said six months; but in my opinion, this is a long-term probably lifelong type of issue that we are not going to get through in six months and everything is going to get back to normal. This is an issue that is going to be one for the child[, R.M.,] and probably more than one child for the indefinite future. And I don't believe any of the parents are prepared now and likely wouldn't be prepared within a reasonable time to deal with the trauma and the care [that R.M.] and the [C]hildren need.
>
> The fact that there are five children does complicate things because it is hectic. It is chaotic. I am not blaming the parents for that. These are five little kids that require a lot of attention, a lot of individual care, which with the parents' own issues and own needs, I don't think in the foreseeable future that they can care for five kids. And it is just not something I believe they are capable of doing what they need to do to be able to care for the five kids. And it is not fair to anyone or several of them to split them up and say, "Okay. You go with Mom and Dad, and you can't go with Mom and Dad" or "You go with Mom and Dad now, and you can go later."
>
> It is just a lack of stability all together. And the parents haven't demonstrated that they can maintain stability with their housing and legal issues. I do think there has been some progress made, and I am not in any way suggesting that any of the parents are bad people. I know they tried, but it is an unfortunate

- 10 -

> situation. They have no control over some [of] the issues for the benefits of the kids.
>
> . . . .
>
> Reasonable efforts have been made by the agency to finalize the permanency plan. Services have been made available to all of the parents. The permanency plan is not appropriate, but the concurrent plan of adoption is.
>
> The agency has engaged in family finding. There are no other family members that have been reported through the many hearings that were determined to be available.
>
> The [C]hildren are safe, and we have heard about the special needs of [R.M.] with the trauma therapy and the medical needs of the [C]hildren.

Notes of testimony, 3/22/19 at 134-136.

The record reflects that although the trial court recognized that Mother has made some progress, it properly focused on the Children's safety, permanency, and well-being. Moreover, the record supports the trial court's determinations as being in the best interests of the Children. Accordingly, with respect to Mother's first and second arguments, we discern no abuse of discretion.

In her final argument, Mother contends that the trial court could not determine the Children's best interests because it failed to conduct an individual bonding analysis to assess the "the nature of [the Children's] individual bonds with [Mother]" and that the Children's best interests cannot be served because sibling separation is disfavored. (Mother's brief at 9.)

- 11 -

Mother failed to include these claims in her Rule 1925(a)(2)(i) statements and, therefore, waives them on appeal.  Pa.R.A.P 302(a) (providing that issues not raised in the trial court are waived and cannot be raised for the first time on appeal).  Nevertheless, we note that nothing in Section 6351(f) of the Juvenile Act requires a trial court to conduct a bonding analysis to support a goal-change order.  Additionally, "the general rule disfavoring separation of siblings . . . is not controlling" because "no absolute constitutional or statutory right to be raised with a sibling yet exists in our jurisprudence."  *In re R.P.* 956 A.2d 449, 458 (Pa.Super. 2008).  It is within the discretion of the trial court to place children according to the individual best interests of each child.  *Id.* (citation omitted).  "The health, safety, and welfare of each child supersede all other considerations."  *Id.* (citation omitted).  Therefore, even if Mother had properly preserved these claims, they would warrant no relief.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/23/2019

- 12 -