J-S15032-21
J-S15033-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.S., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1137 WDA 2020 |

Appeal from the Order Entered September 23, 2020
In the Court of Common Pleas of Jefferson County Civil Division at
No(s):  CP-33-DP-0000052-2017

| | | |
|---|---|---|
| IN RE: J.D.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.S., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1138 WDA 2020 |

Appeal from the Order Entered September 23, 2020
In the Court of Common Pleas of Jefferson County Civil Division at
No(s):  CP-33-DP-0000053-2017

J-S15032-21
J-S15033-21

IN RE: J.D.S.            :     IN THE SUPERIOR COURT OF
                                     :           PENNSYLVANIA
                                     :
APPEAL OF: K.S., MOTHER    : 
                                     :
                                     :
                                     :
                                     :
                                     :    No. 1139 WDA 2020

Appeal from the Order Entered September 25, 2020
In the Court of Common Pleas of Jefferson County Civil Division at
No(s): CP-33-DP-0000053-2017

IN RE: J.S.                :     IN THE SUPERIOR COURT OF
                                     :           PENNSYLVANIA
                                     :
APPEAL OF: K.S., MOTHER    : 
                                     :
                                     :
                                     :
                                     :
                                     :    No. 1140 WDA 2020

Appeal from the Order Entered September 25, 2020
In the Court of Common Pleas of Jefferson County Civil Division at
No(s): CP-33-DP-0000052-2017

BEFORE:    LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                  **FILED: JULY 1, 2021**

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

Appellants, J.S., Sr. ("Father") and K.S. ("Mother") appeal[1] the September 23, 2020 Orders that changed the permanency goal for their children, J.S., a female born in December 2003, and J.D.S., a male born in July 2007 (collectively, "the Children"), from reunification to adoption, pursuant to the Juvenile Act, 42 Pa.C.S. § 6351. Additionally, Father's counsel filed a motion to withdraw and brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). Upon review, we affirm the goal change orders and grant counsel's motion to withdraw.

As a matter of background, Jefferson County Children and Youth Services ("CYS") has been involved with this family since 2017. On July 13, 2017, CYS filed dependency petitions and alleged that the Children were without proper parental care or control. 42 Pa.C.S. § 6302(1). Specifically, CYS received a report that indicated that the Children were physically fighting with one another, throwing things, and not listening to Mother. Mother stated several times to a service provider that she could not handle the Children any longer and she wanted them out of her home. On August 30, 2017, the trial court held a hearing on the dependency petitions. In orders dated August 30, 2017, and entered on September 6, 2017, the trial court adjudicated the

---

[1] This Court, on November 25, 2020, *sua sponte* consolidated Father's appeals with regard to each of the Children. On December 1, 2020, this Court also *sua sponte* consolidated Mother's appeals with regard to each of the Children. On December 8, 2020, the trial court filed one Opinion in this matter that addressed both parents' challenges to the goal change of the Children. Thus, we address both parents' challenges in one memorandum for ease of disposition.

Children dependent. The orders directed that the Children remain in their separate foster care placements. On June 27, 2018, the trial court ordered termination of court supervision, and reunified the Children with Mother and Father. However, CYS continued to receive multiple referrals regarding the family.

On November 10, 2019, CYS received a report that J.S. returned home from the Meadows Psychiatric Center and resumed her previous behaviors of screaming, not listening, and refusing to follow instructions. Mother and J.S. engaged in a verbal altercation that prompted the caseworker to call the police. On November 12, 2019, the trial court granted CYS emergency protective custody of J.S., and she was placed in foster care. On December 5, 2019, J.S. was placed in a Group Home at Pathways Adolescent Center because her foster care placement was not able to manage J.S.'s behaviors. Mother and Father eventually ended their tumultuous relationship, and J.D.S. remained in Father's home. On July 24, 2020, J.S. moved to a Group Home at Bethesda Lutheran Services because her previous placement did not believe that J.S. would make any more progress with them. On September 17, 2020, J.S. moved to a Residential Treatment Facility at Perseus House-Andromeda House for her to receive the mental health services she requires.

On or about July 31, 2020, the trial court granted CYS emergency custody of J.D.S. due to lack of parental care and control in Father's home. N.T., 9/23/20, at 5. At that time, Mother was incarcerated because she

violated a PFA order that Father filed against her. *Id.* at 20 and 25. J.D.S. was placed in the same foster care home where he previously resided. On August 4, 2020, the trial court adjudicated J.D.S. dependent. On September 2, 2020, the trial court entered a no-contact order between Father and CYS because Father was continuously verbally abusive, harassing, and behaved inappropriately to all personnel assigned to assist the family in the home.

The trial court held an adjudication hearing on September 23, 2020. Rebecca Sallack, a caseworker for CYS, testified that the underlying basis for emergency custody of J.D.S. was due to the "continuous trauma that this child has dealt with over the course of his life." *Id.* at 29. More specifically, she testified that Father constantly "badmouthed" and made "inappropriate comments" about Mother, in front of J.D.S., to the home health nurse, to CYS and to service providers. *Id.* at 7. Ms. Sallack stated that Father was argumentative when asked if pest management could perform an evaluation after reports of a bed bug infestation of the home. *Id.* at 8. Ms. Sallack explained that Father "fought" CYS until "after multiple attempts he eventually gave in and said, Whatever, with an attitude, to have the home looked at…. [W]hen pest management did the evaluation, they found bed bugs in the home. [Father] then stated that [CYS] asked pest management to say there was [sic] bed bugs in the home." *Id.* Father was also argumentative regarding counseling for J.D.S. *Id.* at 9. Ms. Sallack stated that multiple service providers indicated that Father behaved inappropriately, was

aggressive, and made them feel uncomfortable. *Id.* at 10-11. Ms. Sallack explained that Father was "constantly argumentative, belligerent, verbally aggressive, takes very little responsibility for his part of the kids being removed, [and] blames [Mother] for the majority of the issues." *Id.* at 12. Ms. Sallack recounted an incident where Father choked J.S. and admitted that he told J.S. "she will have to be a little [f------] whore to keep a roof over her head." *Id.* at 13-14.

With regard to Mother, Ms. Sallack testified that there was an extensive history of Mother's aggressive behavior towards Father and the Children. *Id.* at 27. Notably, Ms. Sallack testified that a no-contact order was put in place between J.S. and Mother because "the phone calls [between them] were getting aggressive, and [J.S.'s] behaviors were increasing…she was fighting with peers, fighting with staff, threatening to harm herself, [and] threatening suicide." *Id.* at 17 and 26. Ms. Sallack testified that chaos, noise, and arguments exacerbate symptoms of anxiety for J.S. *Id.* at 34. Ms. Sallack explained that J.S. should avoid conflicts and interactions with people who cannot manage their behaviors, and recommended a goal change for J.S. *Id.*

Ms. Sallack opined that the Children need a plan for permanency. *Id.* at 27. She explained, "[t]his has gone on entirely too long, and it's- - like I said, this is not something that's new. If you go back through the case record, and this fighting and this bickering and the police [being] called, this is years and years and years on these kids." *Id.* at 27.

On the record at the conclusion of the September 23, 2020 hearing, the trial court stated it would change the Children's goals to adoption, and it entered the orders on that same date. On October 29, 2020, Father and Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On January 29, 2021, Father's counsel filed a motion to withdraw and *Anders* brief in this Court.

Initially, we must consider the motion to withdraw that Father's counsel filed before we may consider counsel's *Anders* brief. Here, Father is appealing the orders changing the Children's permanency goal to adoption, but there have not yet been any termination decrees. Previously, this Court has addressed whether *Anders* is applicable in a matter involving a goal change. We stated that, where an appeal from a termination decree was present, there was no question that *Anders* applied to the goal change as well. We stated:

> The *Anders* procedure, whereby court-appointed counsel may seek to withdraw if he or she concludes that an appeal is wholly frivolous, initially applied to direct appeals in criminal matters. In *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992), this Court extended the *Anders* procedure to appeals from decrees involuntarily terminating parental rights. Since then, we have routinely applied the *Anders* procedure to appeals from goal change orders, so long as the appellant also is appealing from an involuntary termination decree.

*In re J.D.H.*, 171 A.3d 903, 905 (Pa Super. 2017).

However, this Court, in ***In re J.D.H.***, held that the ***Anders*** procedure also applies in appeals from goal change orders, even in the absence of an involuntary termination decree. Any court-appointed counsel who wishes to withdraw under these circumstances must inform the parent of his or her right to counsel in any subsequent dependency or involuntary termination proceedings. Counsel must also inform the parent that, if he or she cannot afford counsel, he or she may contact the trial court to obtain new counsel. This information must be conveyed to the parent at the same time counsel informs the parent of his or her other rights pursuant to ***Anders***, as discussed below. ***See In re J.D.H.***, 171 A.3d at 906-907.

This Court explained:

[t]o withdraw pursuant to ***Anders***, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [***Anders***] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

***Commonwealth v. Cartrette***, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing ***Commonwealth v. Lilley***, 978 A.2d 995, 997 (Pa. Super. 2009)). With respect to the third requirement of ***Anders***, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or

- 8 -

her of their rights." **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an **Anders** brief must comply with the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361.

**See In re J.D.H.**, 171 A.3d 907.

Here, Father's counsel filed a brief, which includes a summary of the history and facts of the case, a potential issue that could be raised by Father, and counsel's assessment of why that issue is meritless, with citations to the record and to relevant legal authority. However, counsel initially did not file her motion to withdraw, nor did she attach a letter to Father informing him of his right to hire a private attorney, to proceed on his own, or to raise any additional points he deems worthy of this Court's attention. As a result, this Court issued a *per curiam* order on February 3, 2021, instructing counsel that

she must provide Father with a new letter advising him of his rights, and clarifying that he must exercise those rights now, before this Court rules on his motion to withdraw.

Counsel complied with our order by filing a motion to withdraw and a copy of a letter to Father in this Court on February 17, 2021. In her new letter, counsel advised Father correctly that he has the right to hire a private attorney, to proceed on his own, or to raise any additional points he deems worthy of this Court's attention now, and that he cannot wait until this Court rules on counsel's motion to withdraw. Father has not exercised any of these rights. Thus, counsel now has complied with the requirements of *Anders* and *Santiago*. We therefore may proceed to review the issue outlined in counsel's *Anders* brief. We must also "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted). *See In re J.D.H.*, 171 A.3d at 907.

Counsel's *Anders* brief for Father raises one issue:

> Whether the trial court erred in changing the permanency goal to adoption?

Father's (*Anders*) Brief, at 5.

In her brief, Mother raises the identical issue:

> Whether the [trial court] erred in changing the permanency goal to adoption?

Mother's Brief, at 4.

- 10 -

We address this issue mindful of the following.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Further, we have instructed:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Essentially, Mother and Father argue that CYS failed to prove that changing the Children's permanent placement goals from reunification to adoption would be in their best interests. More specifically, Mother contends that she previously demonstrated an ability to properly parent the Children

and that separating from Father alleviated the source of conflict. Mother's Brief at 11.

The trial court explained its decision to change the Children's goals to adoption as follows, in relevant part:

> With regard to appellants' daughter, it could not be clearer that the goal change is in her best interests. When CYS first became involved with the family in 2017, both parents wanted her (and her brother) out of the home, as they could not control her (or her brother). That was Father's preference in November of 2019. Neither he nor Mother could control their daughter's aggressive behavior, which simply mirrored their own, and neither recognized, then or now, his or her contribution to the girl's anxiety and belligerence. In the months to follow, Mother reaffirmed her inability to create the sort of environment her daughter needed to thrive, making it necessary for the [c]ourt to discontinue contact between the two when their telephone calls became combative and caused the girl to regress in her treatment.
>
> Father, meanwhile, thought that telling his then 13-year-old daughter that she would have to be a "little [f------] whore" to keep a roof over her head was excusable as merely the sort of thing one person tells another in anger but does not mean. The problem, though, was that the incident was not anomalous. On the contrary, Father apparently thrives on anger and turmoil, which trigger his daughter's anxiety, and seems to be unwilling or unable to change in that regard. That is, in any event, the only reasonable conclusion the [c]ourt could reach when, after extensive [counseling]- one of the few Agency requirements with which he has willingly complied- he shows a disturbing lack of insight about his own temper and other ill-considered behaviors, as well as the psychological harm he has inflicted on his children. At the same time, to say that he has refused to

cooperate with CYS would be an understatement. More than passively refusing to comply with its requirements, Father has been consistently argumentative, inappropriate, and even threatening to the point that the [c]ourt granted its request to terminate all contact with him.

The September 23, 2020 hearing transcript, in and of itself, is less enlightening with respect to appellants' son. When CYS petitioned for emergency custody in the latter half of 2020, though, it recounted various incidents of abuse, mostly psychological, perpetrated against the boy by both appellants. The [c]ourt deemed those allegations to be credible, including that the child's denials and apparent equanimity were occasioned by successful coaching and thus did not necessarily reflect his actual experiences and feelings. Those experiences, as the caseworker testified, included constant arguments with Father, repeated efforts by Father to belittle Mother and blame her for all the family's problems, and expecting a 13-year-old boy to make adult decisions no child should be asked to make.

Little was said about Mother's interactions with her son, though it was clear from the original petition that they, too, were problematic. Without question, moreover, Mother exposed both her daughter and her son to the violence and ugliness that punctuated her and Father's relationship for years and, as indicated above, has not gained the skills or self-awareness to control her own impulses in order to provide the nurturing, positive kind of environment her son needs to become an emotionally healthy adult.

By changing the permanency goal from reunification to adoption, the [c]ourt thereby ensured that neither child would be returned to a volatile home situation. As the case worker [sic] testified, the appellants' daughter has improved since communications with her parents were severed, and changing her goal means that CYS can work toward finding her a stable foster family once she returns from the residential treatment facility she was transferred to earlier this

year. Out of their care, the appellants' son is also doing well in counselling and living with a family he stayed with previously and which is willing to provide a long-term home for him. By changing the permanency goal from reunification to adoption, then, the [c]ourt did not abuse its discretion; it instead acted in the children's best interests, which were the only interests the law instructed it to consider on September 23, 2020.

Trial Court Opinion, December 8, 2020, at 1-3.

Our review of the certified record supports the trial court's decision. The trial court credited Ms. Sallack's opinion that the Children's permanency goal should be changed to adoption and explained the following:

I reviewed all the referrals and references to this family and these altercations, the name-calling, Crisis being called, police being called. None of this is new to this family. This has been going on for many years. Caseworkers struggle working with the family, trying to keep them focused. It's constant going back to the past, and it's so hard to get them to move forward. Neither parent has been able to set aside their differences with each other, the agency, anybody to do what's needed or necessary for their kids.

N.T., 9/23/20, at 14.

Significantly, Ms. Sallack testified that J.D.S. is doing well in his current foster home. N.T., September 23, 2020, at 5. J.D.S. is attending counseling and doing well in school. *Id.* at 5-6. His current placement is a long-term placement option. *Id.* at 37. At the time of the hearing, J.S. was in placement twenty months and twenty-nine days since 2017. *Id.* at 15. J.D.S. was in placement for thirteen months and nine days since 2017. *Id.*

Our independent review of the record does not reveal any non-frivolous issues overlooked by Father's counsel. *See Flowers*, 113 A.3d at 1250; *In re J.D.H.*, 171 A.3d at 910. Thus, the record demonstrates that Mother and Father remained in no position to provide appropriate parental care or control for Children at the time of the goal change hearing, despite years of opportunities. It was within the trial court's discretion to conclude that the Children's lives should not remain on hold indefinitely, and that a goal change to adoption would be in their best interests. *See In re J.D.H.*, 171 A.3d at 910 (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006)) ("'[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.'").

Based on the foregoing analysis, the trial court did not abuse its discretion by changing the Children's permanent placement goals to adoption. Therefore, we affirm the trial court's September 23, 2020 order. Father's counsel's motion to withdraw pursuant to *Anders* is granted.

Order affirmed. Father's counsel's motion to withdraw granted.

J-S15032-21
J-S15033-21

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date:  7/1/2021